701 A.2d 1248

NEW JERSEY TRANSIT PBA LOCAL 304, PLAINTIFF–
APPELLANT, v. NEW JERSEY TRANSIT CORPO-
RATION, DEFENDANT–RESPONDENT.

Argued April 28, 1997—Decided September 25, 1997.

534

*Stephen B. Hunter* argued the cause for appellant (*Klausner and Hunter*, attorneys).

*Robert A. Shire*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney; *Jeffrey C. Burstein*, Deputy Attorney General, of counsel; *Mr. Shire* and *Eldad Phillip Isaac*, Deputy Attorney General, on the briefs).

*James Katz* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey (*Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano*, attorneys).

*Anthony J. Fusco, Jr.*, submitted a brief on behalf of *amicus curiae* New Jersey State Lodge of Fraternal Order of Police.

*Paul L. Kleinbaum*, submitted a brief on behalf of *amicus curiae* New Jersey State Policemen's Benevolent Association (*Zazzali, Zazzali, Fagella & Nowak*, attorneys).

The opinion of the Court was delivered by

PORITZ, C.J.

To comply with regulations promulgated by the Federal Transit Administration ("FTA"), defendant, New Jersey Transit Corporation ("NJ Transit" or "Agency"), adopted a drug and alcohol testing policy that includes random testing of employees responsi-

ble for safety-sensitive functions. Plaintiff New Jersey Transit PBA Local 304 ("PBA" or "plaintiff"), challenged the constitutionality of the random testing provisions applicable to NJ Transit police officers. The Law Division granted summary judgment in favor of NJ Transit, and the Appellate Division affirmed. 290 *N.J.Super.* 406, 675 *A.*2d 1180 (1996). We granted certification, 147 *N.J.* 259, 686 *A.*2d 761 (1996), to consider whether mandatory random drug testing of transit police officers who carry firearms for security purposes violates the officers' right to be free from unreasonable searches and seizures as guaranteed by Article 1, Paragraph 7 of the New Jersey Constitution. We now affirm.

## I

### -A-

NJ Transit is a public corporation within the Department of Transportation responsible for acquiring, operating, and improving public transportation facilities in New Jersey. *N.J.S.A.* 27:25–2, –4a, –5, –10. By its enabling legislation, the Agency is authorized to "comply with federal statutes, rules and regulations, and qualify for and receive all forms of financial assistance available under federal law to assure the continuance of, or for the support or improvement of public transportation." *N.J.S.A.* 27:25–5g. At the present time, NJ Transit receives substantial federal funding from the FTA which, by the end of fiscal year 1996, had contracted to provide approximately $1 billion in current and future assistance to the Agency.

The NJ Transit Police Department was established within the Agency to provide police and security protection to all NJ Transit locations and services. *N.J.S.A.* 27:25–15.1a. Transit police officers "have general authority, without limitation, to exercise police powers and duties ... in all criminal and traffic matters at all times throughout the state." *Ibid.* They must comply with policies established by the Attorney General, *ibid.*, and must satisfy "requirements established by the Police Training Commission,"

*N.J.S.A.* 27:25–15.1c. As officers of a state police force, they are permitted to carry firearms, *see N.J.S.A.* 2C:39–6a(7)(a), and to use deadly force in certain circumstances, *N.J.S.A.* 2C:3–3, –7.

Plaintiff is the majority representative of approximately one hundred twenty-five transit police officers under the rank of captain. Six of the officers were assigned to ride on the Agency's trains as of April 1995; the others perform patrol and investigatory police duties and functions similar to those performed by municipal and county police officers. The majority are assigned to patrol NJ Transit's main terminals in Newark, Hoboken and Atlantic City, and carry out their responsibilities among heavy concentrations of transit riders. The remaining officers are assigned to patrol smaller train stations and railroad rights-of-way throughout the state.

### -B-

In 1991 Congress enacted the Omnibus Transportation Employee Testing Act of 1991 ("Act" or "Federal Act"), *Pub.L.* 102–143, 105 *Stat.* 952 (1991) (codified as amended in scattered sections of 49 *U.S.C.A.*), to address alcohol and drug testing of workers in safety-sensitive positions throughout the transportation industry. Relevant here, the Act as amended directs the Secretary of Transportation to issue rules requiring mass transit operators receiving federal funds to conduct pre-employment, reasonable suspicion, random, and post-accident testing for drug and alcohol use by employees responsible for safety-sensitive functions. 49 *U.S.C.A.* § 5331(b). As considered appropriate by the Secretary and provided in the rules, employees determined "to have used or been impaired by alcohol when on duty" or "to have used a controlled substance, whether or not on duty," unless allowed for medical reasons, may be disqualified for a specified period or dismissed from their employment. *Id.* § 5331(c)(1). Congress expressly provided that failure to institute the specified drug and alcohol testing programs would result in ineligibility for federal funding. *Id.* § 5331(g).

The anti-drug and alcohol misuse policies applicable to mass transit operators are set forth in regulations issued under the Act. *See* 49 *C.F.R.* pts. 653, 654 (1997); *see also id.* pt. 40 (setting forth procedures to be followed for drug and alcohol testing). The regulations are designed "to deter and detect the use of prohibited drugs by covered employees," *id.* § 653.3, and "to help prevent accidents and injuries resulting from the misuse of alcohol by employees who perform safety-sensitive functions," *id.* § 654.1. More specifically, the regulations provide for random drug and alcohol testing of "covered employees," *id.* §§ 653.47, 654.35, defined as those employees who perform safety-sensitive functions including, among other things, "carrying a firearm for security purposes," *id.* §§ 653.7, 654.7. Employees who refuse to participate in the testing program are required to cease performing safety-sensitive functions. *Id.* §§ 653.35(a), 654.29.

-C-

For the purpose of complying with the FTA regulations, NJ Transit instituted a comprehensive drug and alcohol-free workplace policy that became effective January 1, 1995. NJ Transit's policy consists of a *Core Policy* and two Addenda. *See* NJ TRANSIT Corporate–Wide Policy, *Drug and Alcohol–Free Workplace Core Policy* (January 1, 1995); *Drug and Alcohol–Free Workplace Policy—Addendum I* (January 1, 1995) (requirements applicable to employees who perform safety-sensitive functions); *Drug and Alcohol–Free Workplace Policy—Addendum II* (January 1, 1995) (requirements applicable to employees who perform rail-covered services). The purpose and goals of the *Core Policy* are described in Sections I and II:

> The purpose of this policy is to ensure that NJ TRANSIT operates in the safest and most efficient manner possible and to promote the safety and welfare of our employees and customers by creating a drug and alcohol-free workplace and ensuring that our employees are free from the effects of drugs and alcohol.
>
> .    .    .    .    .    .    .    .
>
> NJ TRANSIT'S goal to achieve a drug and alcohol-free workplace shall be accomplished through the implementation of a comprehensive anti-drug and alcohol

program based on deterrence, detection, assistance and enforcement. The program objectives in support of this goal are to prevent drug and alcohol abuse, to assist employees who seek help, to detect drug and alcohol abuse, and to enforce NJ TRANSIT's policy.

The *Core Policy* sets forth the drug and alcohol testing program generally, while *Addendum I* "outlines those requirements of NJ TRANSIT's Drug and Alcohol–Free Workplace Policy that are applicable only to NJ TRANSIT employees who perform safety-sensitive functions." *Addendum I* § I. In its complaint, plaintiff challenged both the random drug and random alcohol testing components of NJ Transit's policy as applied to "law enforcement personnel represented by PBA Local 304." However, plaintiff has not argued before this Court that the alcohol testing component of the program is unconstitutional. We will therefore limit our review to PBA's claims vis-à-vis random drug testing as that testing is implemented by NJ Transit through *Addendum I* and the *Core Policy*.

Under *Addendum I,* all NJ Transit employees, including supervisors and volunteers, are subject to "pre-employment, reasonable suspicion, post-accident, random, return-to-duty, and follow up testing" if they perform safety-sensitive functions. *Id.* § IV.A–B. Because transit police officers carry firearms for security purposes, they perform a safety-sensitive function and are subject to random testing. *Id.* § II. Previously, transit police officers had been subject to drug testing as specified by the Attorney General's *Revised Law Enforcement Drug Screening Guidelines* (August 1990) ("Guidelines"). The *Guidelines,* promulgated in October 1986 and revised in 1990, provided for drug testing of permanent police officers only when the employer had an individualized reasonable suspicion that the officer had used or was using controlled substances. *Id.* at 8–1. *Addendum I* substantially altered the rules for drug testing of transit officers. Like other NJ Transit-covered employees, transit officers are now selected for unannounced testing "by a computer-based random number generator that is matched with the employee's [identification] number." *Addendum I* § IX.B.

NJ Transit's *Core Policy* requires the Agency and its certified laboratory to "maintain clear and well-documented procedures for collection, shipment" and recording of specimens. *Core Policy* § IX.B. Specimens are handled by a trained medical technician or licensed medical professional, *id.* § IX.C.1, at "secure, designated ... sites" equipped to provide proper "collection, security, temporary storage, and shipping" to the laboratory, *id.* § IX.D.1. The person handling the sample is responsible for the integrity of the collection and transfer process, *id.* § IX.D.1, 2, 5, 6, and may not be a supervisor or co-worker of the tested employee, *id.* § IX.C.2. Unless NJ Transit has reason to believe that the donor may adulterate the sample, individual privacy must be permitted during collection. *Id.* § IX.F.1 (listing four circumstances constituting grounds for "reason to believe that an individual may alter or substitute a specimen," *e.g.*, a previous urine sample that "falls outside the normal temperature range"). Any direct observation of the donor must be by a person "of the same gender" and requires prior approval by a supervisor. *Id.* § IX.F.2.

Two urine samples are obtained from transit police officers at the collection site. Each sample is then separated into a "primary" and "split" specimen for testing at a laboratory certified under the Department of Health and Human Services' ("DHHS") Mandatory Guidelines for Federal Workplace Drug Testing Programs. *Id.* § IX.G.1. The first primary specimen is analyzed for marijuana, cocaine, opiates, phencyclidine or amphetamines using "an immunoassay which meets the requirements of the Food and Drug Administration for commercial distribution." *Id.* § IX.G.2. If this specimen tests positive, the result is confirmed using gas chromatography/mass spectrometry. *Id.* § IX.G.3. The second primary specimen is similarly analyzed for barbiturates, benzodiazepines and methadone.[1] *Id.* § IX.G.4. If either primary speci-

---

[1] These substances are not listed in the FTA's regulations. *See* 49 *C.F.R.* § 653.31(b). We presume that they have been approved for testing by the FTA pursuant to 49 *C.F.R.* § 40.21 and note that plaintiff has not specifically challenged this additional testing by NJ Transit.

men tests positive, the employee has 72 hours in which to exercise his or her option to have the split specimen tested by a different DHHS-certified laboratory. *Id.* § IX.G.5.

The *Core Policy* requires NJ Transit to employ one or more Medical Review Officers ("MRO"). *Id.* § IX.H.1. The MRO must be a licensed physician with knowledge of substance abuse disorders who is able to review and interpret positive test results. *Ibid.* Test results are not deemed positive, and may not be disseminated to any person, until they are reviewed and verified by the MRO. *Id.* § IX.H.2. In addition to verifying the chain of custody and the reasonableness of the laboratory report, the MRO must "[e]xamine alternate medical explanations for positive drug test results," and must give each employee "an opportunity to discuss the test results" prior to verifying a positive test. *Id.* § IX.H.2.a-d.

The MRO is required to report all verified positive test results to the appropriate management official and to provide copies of the report to the employee. *Id.* § IX.H.2.g. Those positive results that have "a legitimate medical explanation or which are scientifically insufficient for further action" are reported as negative. *Id.* § IX.H.2.e. All negative results are also promptly reported to the employee. *Id.* § IX.H.2.h. Records of testing results are "maintained in a secure location with controlled access" and, pursuant to federal regulation, *see* 49 *C.F.R.* 653.71(b), may be kept for only a limited number of years. *Core Policy* § XIII.B. Test results may be released on written request of the employee, to "the decision maker in a lawsuit, grievance, or other proceeding initiated by or on behalf of the employee tested," to certain federal agencies, "or to a State oversight agency with regulatory authority over NJ TRANSIT." *Id.* § XIII.A.1–5. *Addendum I,* in reliance on the Attorney General's *Guidelines,* further requires transit officers' positive results to "be included in a central registry maintained by the Division of State Police to be accessed only through a court order or as part of a confidential investigation

related to law enforcement employment; and reported to the county prosecutor." *Addendum I* § XIII.A.1.

The *Core Policy* includes provisions establishing an employee assistance program ("EAP") for covered employees who need assistance with use of controlled substances. *Core Policy* § VIII. Employees may participate in the program on a voluntary basis, *id.* § VIII.B, or may be required to participate if they test positive for drugs and have not previously had a positive drug test, *id.* § VIII.C. The *Core Policy* provides, however, that transit officers are not eligible for participation in EAP and that a transit officer who tests positive for illegal drugs must be dismissed. *Id.* § VIII.B.3. Thus, a transit officer "cannot avoid[ ] [dismissal] by utilization of the EAP, even on a voluntary basis." *Ibid.* This provision also reflects NJ Transit's interpretation of the requirements of the Attorney General's *Guidelines*.

### -D-

On April 26, 1995, PBA filed a complaint in the Law Division alleging that NJ Transit's random drug and alcohol testing of law enforcement officers represented by PBA Local 304 constituted an illegal search and seizure in violation of Article I, Paragraph 7 of the New Jersey Constitution. The PBA also sought temporary restraints preventing the Agency from implementing testing as to those officers. PBA did not challenge pre-employment testing, or testing either conducted at an annual physical exam or based on reasonable individualized suspicion.

As a defense, NJ Transit asserted that the Federal Act preempted state action inconsistent with federally required testing programs implemented by state transportation agencies in receipt of federal funding.[2] The trial court found that preemption did not

---

[2] NJ Transit based its preemption argument on the provision of the Act that states:

> A State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order that is inconsistent with regulations

apply because NJ Transit is not required to accept federal fund-ing, but concluded that random drug testing of transit police officers was permissible under the New Jersey Constitution. The court denied PBA's application for a restraining order, and en-tered judgment upholding the constitutionality of the testing program and dismissing PBA's complaint.

The Appellate Division affirmed in a unanimous opinion. 290 *N.J.Super.* 406, 675 *A.*2d 1180 (1996). In sustaining NJ Transit's program, the court adopted the special needs balancing test of *Skinner v. Railway Labor Executives' Ass'n,* 489 *U.S.* 602, 109 *S.Ct.* 1402, 103 *L.Ed.*2d 639 (1989), and *National Treasury Em-ployees Union v. Von Raab,* 489 *U.S.* 656, 109 *S.Ct.* 1384, 103 *L.Ed.*2d 685 (1989), and rejected the 1987 Appellate Division opinion in *Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark,* 216 *N.J.Super.* 461, 524 *A.*2d 430 (App.Div.1987) (*"FOP "*), which had held that random drug testing of Newark police officers violated Article I, Paragraph 7 of the New Jersey Constitution. 290 *N.J.Super.* at 422, 675 *A.*2d 1180. The Appel-late Division found that requiring a warrant or individualized suspicion would be impractical, and that the government's interest in preventing the great harm that could occur " 'before any signs of impairment become noticeable to supervisors or others' " out-weighed the privacy interests of transit police officers. *Id.* at 426, 675 *A.*2d 1180 (quoting *Skinner, supra,* 489 *U.S.* at 628, 109 *S.Ct.* at 1419, 103 *L. Ed.*2d at 667).

## II

### -A-

Article 1, Paragraph 7 of the New Jersey Constitution states:

prescribed [under the statute, except] a State criminal law that imposes sanctions for reckless conduct leading to loss of life, injury, or damage to property.

[*49 U.S.C.A.* § 5331(f)(1).]

Because we find that NJ Transit's drug testing program passes constitutional muster, we do not reach the Agency's preemption defense.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.

Both Article 1, Paragraph 7 and the Fourth Amendment to the United States Constitution, which contain virtually identical language, prohibit unreasonable searches and seizures by government agents. *See, e.g., Skinner, supra,* 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661; *Schmerber v. California,* 384 *U.S.* 757, 768, 86 *S.Ct.* 1826, 1834, 16 *L.Ed.*2d 908, 918 (1966); *State v. Pierce,* 136 *N.J.* 184, 208, 642 *A.*2d 947 (1994).

■ Plaintiff does not allege that NJ Transit's testing program is an unreasonable search under the Fourth Amendment; rather, PBA claims that random drug testing of transit police officers is unreasonable under Article 1, Paragraph 7 of the New Jersey Constitution. Preliminarily we observe that mandatory drug testing is subject to the requirements of both the federal and New Jersey Constitutions. Case law in the federal courts and in our state has firmly established that any government-compelled drug or alcohol testing is a search. *See Skinner, supra,* 489 *U.S.* at 617, 109 *S.Ct.* at 1413, 103 *L.Ed.*2d at 660 (finding that government-compelled drug testing was search subject to Fourth Amendment); *Von Raab, supra,* 489 *U.S.* at 665, 109 *S.Ct.* at 1390, 103 *L.Ed.*2d at 701–02 (same); *Rawlings v. Police Dep't of Jersey City,* 133 *N.J.* 182, 188, 627 *A.*2d 602 (1993) ("A drug test performed pursuant to departmental regulations ... is a search subject to the requirements of the Fourth Amendment."); *O'Keefe v. Passaic Valley Water Comm'n,* 132 *N.J.* 234, 242, 624 *A.*2d 578 (1993) (same). The testing program must, therefore, meet the reasonableness requirement of both the Fourth Amendment and Article 1, Paragraph 7.

## -B-

■ Generally, under the Fourth Amendment and under Article I, Paragraph 7, searches or seizures conducted without a warrant

based on probable cause are considered *per se* unreasonable. *See, e.g., Horton v. California,* 496 *U.S.* 128, 133, 110 *S.Ct.* 2301, 2306, 110 *L.Ed.*2d 112, 120 (1990) (observing "general rule that warrantless searches are presumptively unreasonable"); *State v. Hempele,* 120 *N.J.* 182, 217, 576 *A.*2d 793 (1990) ("The New Jersey Constitution requires the approval of an impartial judicial officer based on probable cause before most searches may be undertaken. Any warrantless search is *prima facie* invalid." (citations and internal quotations omitted)). The validity of a warrantless search may, however, be established if the government demonstrates that the search falls within one of the recognized exceptions to the warrant requirement.

■ Traditional exceptions to the warrant requirement have been based on a showing either of probable cause or of reasonable individualized suspicion to believe that the person to be searched has violated the law. *See, e.g., United States v. Ross,* 456 *U.S.* 798, 102 *S.Ct.* 2157, 72 *L.Ed.*2d 572 (1982) (permitting search of vehicle when there was probable cause to believe that vehicle contained contraband); *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968) (permitting police officers to stop suspect based on individualized suspicion that person stopped may have been involved in criminal activity); *State v. Davis,* 104 *N.J.* 490, 505–08, 517 *A.*2d 859 (1986) (allowing investigatory stop when police officer had particularized suspicion of possible criminal activity by defendant); *State v. Martin,* 87 *N.J.* 561, 567–71, 436 *A.*2d 96 (1981) (allowing search of automobile when probable cause existed to believe automobile had been used in robbery). In certain limited circumstances, however, searches conducted without probable cause or reasonable individualized suspicion have been upheld. *See Michigan Dep't of State Police v. Sitz,* 496 *U.S.* 444, 110 *S.Ct.* 2481, 110 *L.Ed.*2d 412 (1990) (permitting sobriety checkpoints at which state police stop all cars to examine drivers for signs of intoxication); *United States v. Martinez–Fuerte,* 428 *U.S.* 543, 96 *S.Ct.* 3074, 49 *L.Ed.*2d 1116 (1976) (allowing border patrol to stop vehicles at immigration checkpoints to inquire about

citizenship and immigration status of occupants). Of particular relevance here, administrative searches of highly or pervasively regulated industries have been permitted without probable cause or individualized suspicion. *See, e.g., New York v. Burger,* 482 *U.S.* 691, 107 *S.Ct.* 2636, 96 *L.Ed.*2d 601 (1987) (upholding suspicionless search of automobile junkyard); *United States v. Biswell,* 406 *U.S.* 311, 92 *S.Ct.* 1593, 32 *L.Ed.*2d 87 (1972) (upholding suspicionless search of gun dealer's locked storeroom); *Colonnade Catering Corp. v. United States,* 397 *U.S.* 72, 90 *S.Ct.* 774, 25 *L.Ed.*2d 60 (1970) (permitting suspicionless searches of premises of liquor licensees); *In re Martin,* 90 *N.J.* 295, 310–16, 447 *A.*2d 1290 (1982) (allowing New Jersey Division of Gaming Enforcement to conduct suspicionless searches of casino licensees).

The pervasively regulated industry exception to the warrant requirement has generally been applied to businesses that have a "long tradition of close government supervision." *Marshall v. Barlow's, Inc.,* 436 *U.S.* 307, 313, 98 *S.Ct.* 1816, 1821, 56 *L.Ed.*2d 305, 312 (1978). *But see Donovan v. Dewey,* 452 *U.S.* 594, 605–06, 101 *S.Ct.* 2534, 2541–42, 69 *L.Ed.*2d 262, 273 (stating that primary factor in applying exception is not length of time business has been regulated, but rather "pervasiveness and regularity" of regulation). Both the federal courts and our New Jersey courts have found that persons who engage in industries " 'subject to close supervision and inspection' " have a diminished expectation of privacy. *In re Martin, supra,* 90 *N.J.* at 313–14, 447 *A.*2d 1290 (finding that casino employees have a "limited" expectation of privacy based on pervasive regulation of casino industry); *see Biswell, supra,* 406 *U.S.* at 316, 92 *S.Ct.* at 1596, 32 *L.Ed.*2d at 92–93 (firearms industry); *Colonnade, supra,* 397 *U.S.* at 77, 90 *S.Ct.* at 777, 25 *L.Ed.*2d at 64–65 (alcohol industry); *New Jersey Dep't of Envtl. Protection v. Duran,* 251 *N.J.Super.* 55, 62–63, 596 *A.*2d 1090 (App.Div.1991) (fishing industry). Nonetheless, warrantless searches conducted under the pervasively regulated industry exception are

> deemed to be reasonable only so long as three criteria are met. First there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made....
>
> Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." ...
>
> [And, f]inally, "the statute's inspection program, in terms of the certainty and regularity of its application [must] provid[e] a constitutionally adequate substitute for a warrant."
>
> [*Burger, supra,* 482 *U.S.* at 702–03, 107 *S.Ct.* at 2644, 96 *L.Ed.*2d at 614 (citations omitted).]

In the 1980's, a number of courts applied the highly regulated industry exception to uphold random drug testing of employees in certain industries. *See, e.g., Rushton v. Nebraska Public Power Dist.,* 844 *F.*2d 562, 566–67 (8th Cir.1988) (upholding suspicionless drug testing of nuclear power plant employees); *Shoemaker v. Handel,* 795 *F.*2d 1136, 1141–43 (3d Cir.) (upholding random breathalyzer and urine testing of licensed jockeys and other track personnel), *cert. denied,* 479 *U.S.* 986, 107 *S.Ct.* 577, 93 *L.Ed.*2d 580 (1986). In *Shoemaker, supra,* the Third Circuit sustained regulations of the New Jersey Racing Commission requiring random drug testing of jockeys on horse racing days. 795 *F.*2d at 1141–43. The court observed that since 1939, when New Jersey amended its Constitution to legalize horse racing, "the horse racing industry has been among the state's most highly regulated industries." *Id.* at 1141. Finding that "New Jersey has a strong interest in assuring the public of the integrity of the persons engaged in the horse racing industry," and that the jockeys had been "put on notice" they would be tested, the court applied the pervasively regulated industry exception to the Commission's drug testing program. *Id.* at 1142. The court concluded that the program was "sufficiently circumscribed" by implementing guidelines that limited the discretion of those responsible for testing and upheld the Commission's regulations. *Id.* at 1143.

We observe that before 1989, courts that reviewed programs designed to test police officers for drug use differed about whether the officers fell within the highly regulated industry exception. *Compare Policemen's Benevolent Ass'n of New Jersey, Local 318*

*v. Township of Washington*, 850 *F.*2d. 133, 136–41 (3d Cir.1988) (*"PBA Local 318"*) (finding that police are members of highly regulated industry and upholding suspicionless drug testing of police officers), *cert. denied,* 490 *U.S.* 1004, 109 *S.Ct.* 1637, 104 *L. Ed.*2d 153 (1989) *with Capua v. City of Plainfield,* 643 *F.Supp.* 1507, 1518–19 (D.N.J.1986) (finding that fire fighters are not members of pervasively regulated industry), and *FOP, supra,* 216 *N.J.Super.* at 469, 524 *A.*2d 430. (holding that police officers are not members of highly regulated industry). This divergence in views depended on the courts' focus. The *FOP* court, for example, reasoned that police officers were not engaged in a " 'commercial enterprise' ... subject to a 'comprehensive and defined' regulatory scheme." *Id.* (citations omitted). In *PBA Local 318,* the court looked to the statutes and regulations governing police conduct, without considering whether police work is an industry in the traditional sense, and found that police officers were members of a highly regulated industry. 850 *F.*2d at 141; *cf. In re Caruso v. Ward,* 72 *N.Y.*2d 432, 534 *N.Y.S.*2d 142, 530 *N.E.*2d 850, 852–55 (1988) (permitting random drug testing of police officers involved in elite crime unit based, in part, on heightened regulation of unit); *McDonell v. Hunter,* 809 *F.*2d 1302, 1306, 1307–08 (8th Cir.1987) (permitting random drug testing of corrections officers because officers' "subjective expectations of privacy are diminished while they are in the confines of the prison" and because of "institutional interest in prison security").

In 1989, in two cases decided on the same day, the United States Supreme Court considered suspicionless drug testing of certain private railroad workers under regulations of the Federal Railroad Administration, *Skinner, supra,* 489 *U.S.* at 602, 109 *S.Ct.* at 1402, 103 *L.Ed.*2d at 639, and certain United States Customs employees, *Von Raab, supra,* 489 *U.S.* at 656, 109 *S.Ct.* at 1384, 103 *L.Ed.*2d at 685. *Skinner* and *Von Raab,* along with two other cases decided in 1995 and 1997, *Vernonia School Dist. 47J v. Acton,* 515 *U.S.* 646, 115 *S.Ct.* 2386, 132 *L.Ed.*2d 564 (1995) and *Chandler v. Miller,* 520 *U.S.* ——, 117 *S.Ct.* 1295, 137 *L.Ed.*2d 513 (1997), provide a framework for review of governmental drug

testing under the Fourth Amendment of the United States Constitution.

Under the *Skinner/Von Raab* line of cases, a suspicionless search may be permissible when the search serves " 'special needs, beyond the normal need for law enforcement.' " *Chandler, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1301, 137 *L.Ed.*2d at 523 (quoting *Skinner, supra,* 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661). Once the government claims a special need, "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* at ——, 117 *S.Ct.* at 1301, 137 *L.Ed.*2d at 523. This fact-specific inquiry requires a court to "assess the practicality of the warrant and probable-cause requirements in [each] particular context." *Skinner, supra,* 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661. "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Id.* at 624, 109 *S.Ct.* at 1417, 103 *L.Ed.*2d at 664. Especially in the drug testing context, the government's special need "must be substantial—important enough to override the individual's acknowledged privacy interest, [and] sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1303, 137 *L.Ed.*2d at 526.

The Appellate Division applied the *Skinner/Von Raab* special needs test and upheld NJ Transit's program. The panel's approach is consonant with this Court's analysis in *Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 105–07, 609 *A.*2d 11 (1992), wherein the court found "the impracticality of less-intrusive means of detecting drug use and the urgent need to ensure public safety" to outweigh the employee's privacy interests in upholding urine testing for persons in safety-sensitive jobs. *Ibid.; see also O'Keefe, supra,* 132 *N.J.* at 242–46, 624 *A.*2d 578 (reviewing the

special needs test in *dicta* ); *Hempele, supra,* 120 *N.J.* at 218–19, 576 *A.*2d 793 (finding special needs test not applicable to governmental search of garbage because no special need was identified); *International Fed'n of Prof'l & Technical Eng'rs, Local 194A v. Burlington County Bridge Comm'n,* 240 *N.J.Super.* 9, 24–25, 572 *A.*2d 204 (App.Div.) (applying special needs test in upholding urine testing of bridge workers at annual physical examinations), *certif. denied,* 122 *N.J.* 183, 584 *A.*2d 244 (1990).

-C-

*Skinner, Von Raab,* and *Vernonia* sustained suspicionless drug testing after finding a special governmental need that would be jeopardized by adherence to the individualized suspicion standard. The Supreme Court found that the individuals subject to testing had a diminished expectation of privacy because they worked in a highly regulated industry, *Skinner, supra,* 489 *U.S.* at 627, 109 *S.Ct.* at 1418, 103 *L.Ed.*2d at 666, or worked for an agency with a "unique mission" where employees "reasonably should expect effective inquiry into their fitness and probity," *Von Raab, supra,* 489 *U.S.* at 671–72, 674, 109 *S.Ct.* at 1394, 103 *L.Ed.*2d at 706–07, or were school children who traditionally are not afforded the same constitutional protections as adults, *Vernonia, supra,* 515 *U.S.* at 654–57, 115 *S.Ct.* at 2391–92, 132 *L.Ed.*2d at 575–76.

In *Skinner,* the Federal Railroad Administration ("FRA") issued regulations requiring railroad employees to submit to blood and urine tests to detect drug and alcohol use whenever they were "involved in certain train accidents." [3]  489 *U.S.* at 606, 109 *S.Ct.* at 1407, 103 *L.Ed.*2d at 653 (footnote omitted).  The regulations also authorized, but did not require, "railroads to administer breath and urine tests to employees who violate[d] certain safety

---

[3] The FRA promulgated the regulations at issue in *Skinner* under the general authority given to the Secretary of Transportation by the Federal Railroad Safety Act of 1970, 45 *U.S.C.A.* § 431(a), *repealed by Pub.L. No.* 103–272, § 7(b), 108 *Stat.* 1379 (July 5, 1994). The *Skinner* regulations are in some sense precursors of the FTA regulations at issue in this case.

rules." *Id.* at 606, 109 *S.Ct.* at 1407, 103 *L.Ed.*2d at 653. The FRA adopted its drug testing policies in response to evidence indicating "that on-the-job intoxication was a significant problem in the railroad industry," and documenting a link between drug and alcohol impairment and train accidents. *Id.* at 607, 109 *S.Ct.* at 1408, 103 *L.Ed.*2d at 653. Because the employees covered by the policies were engaged in safety-sensitive tasks, and because the purpose of the policies was to promote railway safety and not to prosecute employees for illegal drug use, the court determined that the government had "present[ed] 'special needs' beyond normal law enforcement." *Id.* at 620, 109 *S.Ct.* at 1415, 103 *L.Ed.*2d at 661–62 (citation and internal quotations omitted).

The *Skinner* Court was satisfied that the FRA's standardized testing procedures served a core purpose of the warrant requirement by providing "assurances of certainty and regularity," *id.* at 624, 109 *S.Ct.* at 1417, 103 *L.Ed.*2d at 664, and concluded that delay in testing after an accident or rule violation could result in the loss of evidence of drug use, *id.* at 623, 109 *S.Ct.* at 1416, 103 *L.Ed.*2d at 663–64. In these circumstances, the Court held that the warrant requirement would frustrate the purpose of the program. *Id.* at 623–24, 109 *S.Ct.* at 1416–17, 103 *L.Ed.*2d at 663–64. Turning to the question whether, even in the absence of a warrant, probable cause or individualized suspicion should be required, the Court considered the privacy concerns implicated by the breath, blood and urine testing. *Id.* at 624–27, 109 *S.Ct.* at 1417–18, 103 *L.Ed.*2d at 664–66. The intrusions occasioned by the breath and blood tests were deemed relatively insignificant because these tests are fairly commonplace and minimally inconvenient. *Id.* at 625–26, 109 *S.Ct.* at 1417–18, 103 *L.Ed.*2d at 665.

The Court then addressed the "more difficult question ... presented by the urine testing," which implicated privacy concerns not raised by the breath or blood tests because "the procedures for collecting the necessary samples ... require employees to perform an excretory function traditionally shielded by great privacy." *Id.* at 626, 109 *S.Ct.* at 1418, 103 *L.Ed.*2d at 665–66.

Although these concerns were not minimal, the Court found that the FRA regulations sufficiently limited the intrusiveness of the procedure by providing first, that the samples did not have to be furnished under the direct observation of a monitor, and second, that the collection was to take place in a medical environment similar to that of a physical examination. *Id.* at 626–27, 109 *S.Ct.* at 1418, 103 *L.Ed.*2d at 666. The most important consideration in determining the intrusiveness of the testing regime was that the employees subject to testing had a diminished expectation of privacy because they worked "in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of the covered employees." *Id.* at 627, 109 *S.Ct.* at 1418, 103 *L.Ed.*2d at 666.

The government's interest in testing without individualized suspicion was found to be compelling because the "[e]mployees subject to the tests discharge[d] duties fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences." *Id.* at 628, 109 *S.Ct.* at 1419, 103 *L.Ed.*2d at 667. Detecting drug use among covered employees was considered critical because the "employees who [were] subject to testing under the FRA regulations [could] cause great human loss before any signs of impairment [became] noticeable to supervisors or others." *Ibid.* Balancing the government's compelling interest in testing against the employees' limited privacy interests, the Court concluded that it was "unrealistic, and inimical to the Government's goal of ensuring safety in rail transportation, to require a showing of individualized suspicion in these circumstances." *Id.* at 631, 109 *S.Ct.* at 1421, 103 *L.Ed.*2d at 669. The Court upheld the FRA's suspicionless drug testing requirements.

*Von Raab* sustained the United States Customs Service's suspicionless drug testing of employees prior to placement or employment in positions requiring them to carry firearms or involving drug interdiction. 489 *U.S.* at 656, 109 *S.Ct.* at 1384, 103 *L.Ed.*2d at 685. Although the agency did not claim that the testing program was a response to a demonstrated drug problem within

the Service, *id.* at 660, 109 *S.Ct.* at 1388, 103 *L.Ed.*2d at 698, the Court found that testing addressed important safety concerns associated with work involving drug interdiction and with "positions that require the incumbent to carry a firearm," *id.* at 670–71, 109 *S.Ct.* at 1393, 103 *L.Ed.*2d at 705. These objectives were clearly not designed to serve ordinary law enforcement needs but, rather, "present[ed] a special government need that may justify departure from the ordinary warrant and probable-cause requirements." *Id.* at 666, 109 *S.Ct.* at 1391, 103 *L.Ed.*2d at 702.

*Von Raab* dispensed with the warrant requirement for certain "routine, yet sensitive, employment decisions" because the cumbersome warrant procedures would compromise the Customs Service's mission, and because a warrant would not provide any additional privacy protection beyond the narrowly defined limits of the existing drug testing program. *Id.* at 667, 109 *S.Ct.* at 1391, 103 *L.Ed.*2d at 703. The Court found that, in certain limited circumstances, the government's need to conduct suspicionless searches "is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches." *Id.* at 668, 109 *S.Ct.* at 1392, 103 *L.Ed.*2d at 704. With respect to employees who carry firearms, even if those employees are "not engaged directly in the interdiction of drugs," the Court returned, in part, to concerns expressed in *Skinner:*

> Customs employees who may use deadly force plainly "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." We agree with the Government that the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force. Indeed, ensuring against the creation of this dangerous risk will itself further Fourth Amendment values, as the use of deadly force may violate the Fourth Amendment in certain circumstances.
>
> [*Id.* at 670–71, 109 *S.Ct.* at 1393, 103 *L.Ed.*2d at 705 (quoting *Skinner, supra,* 489 *U.S.* at 628, 109 *S.Ct.* at 1419, 103 *L.Ed.*2d at 667).]

Against this compelling government interest in safety, the Court weighed the intrusion on the employee's privacy interests. Comparing employment in the Customs Service to employment in government agencies such as the United States Mint, the intelli-

gence service and the military, where employees "may not only be required to give what in other contexts might be viewed as extraordinary assurances of trustworthiness and probity, but also may expect intrusive inquiries into their physical fitness for those special positions," the Court found that customs employees "directly involved in the interdiction of illegal drugs or . . . required to carry firearms in the line of duty have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test." *Id.* at 671–72, 109 *S.Ct.* at 1394, 103 *L.Ed.*2d at 706. "Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness." *Id.* at 672, 109 *S.Ct.* at 1394, 103 *L.Ed.*2d at 706.

In *Vernonia*, the Court upheld random drug testing of high school students participating in interscholastic athletic competitions. 515 *U.S.* at 646, 115 *S.Ct.* at 2386, 132 *L.Ed.*2d at 564. In part, *Vernonia* turned on the "public-school context," where teachers and administrators have a "substantial need . . . for freedom to maintain order," *id.* at 653, 115 *S.Ct.* at 2391, 132 *L.Ed.*2d at 574 (citation omitted), and where students " 'have a lesser expectation of privacy than members of the population generally,' " *id.* at 657, 115 *S.Ct.* at 2392, 132 *L.Ed.*2d at 577 (citation omitted). *Vernonia* pointed to a record of alcohol and drug abuse at the school and stressed the significance of deterring drug use among school children generally, and among athletes specifically. *Id.* at 661–63, 115 *S.Ct.* at 2395, 132 *L.Ed.*2d at 580. These interests weighed heavily against the students' diminished expectation of privacy and tipped the balance such that the Court found the school district's random drug testing policy reasonable. *Id.* at 664–65, 115 *S.Ct.* at 2396, 132 *L.Ed.*2d at 582.

Most recently, the Court reaffirmed the continued validity of the special needs balancing approach, but struck down a Georgia statute requiring candidates for designated state offices to provide proof that they had tested negative for drug use within thirty days

prior to nomination or election. *Chandler, supra,* 520 *U.S.* at
——, 117 *S.Ct.* at 1299, 137 *L.Ed.*2d at 520. In the Court's view,
the State had failed to establish a special need because it had not
presented "any indication of a concrete danger demanding depar-
ture from the Fourth Amendment's main rule." *Id.* at ——, 117
*S.Ct.* at 1303, 137 *L.Ed.*2d at 526. Georgia had not claimed that
the testing program was instituted in response to a drug problem
amongst state office holders; to the contrary, the state had
admitted that there was no such problem. Rather, Georgia said
the statute was "justified ... because the use of illegal drugs
draws into question an official's judgment and integrity; jeopard-
izes the discharge of public functions ... and undermines public
confidence and trust in elected officials." *Id.* at ——, 117 *S.Ct.* at
1303–04, 137 *L.Ed.*2d at 526.

The Court acknowledged that, based on *Von Raab,* a "demon-
strated problem of drug abuse [is] ... not in all cases necessary to
the validity of a testing regime." *Id.* at ——, 117 *S.Ct.* at 1303,
137 *L.Ed.*2d at 526 (citing *Von Raab, supra,* 489 *U.S.* at 673–75,
109 *S.Ct.* at 1395, 103 *L.Ed.*2d at 707–08). Justice Ginsburg was,
however, quite clear on the significance of this aspect of *Von
Raab:* "Hardly a decision opening broad vistas for suspicionless
searches, *Von Raab* must be read in its unique context." *Id.* at
——, 117 *S.Ct.* at 1304, 137 *L.Ed.*2d at 527. She pointed out that
the customs officers in *Von Raab* were regularly in contact with
criminal organizations dealing in large quantities of drugs and
that, unlike high-level state officials, the officers carried out their
responsibilities away from the scrutiny of their superiors and
certainly outside the scrutiny of the general public. *Id.* at ——,
117 *S.Ct.* at 1304, 137 *L.Ed.*2d at 527–28 (citation omitted). Jus-
tice Ginsburg found Georgia's testing scheme particularly disturb-
ing because it was barely "credible [as a] means to deter illicit
drug users from seeking election to state office." *Id.* at ——, 117
*S.Ct.* at 1303, 137 *L.Ed.*2d at 526. Where the special need was no
more than a symbolic statement about the struggle against drug
abuse, even a minimally intrusive testing program could not be
upheld. *Id.* at ——, 117 *S.Ct.* at 1305, 137 *L.Ed.*2d at 526.

Post-*Skinner/Von Raab* cases that have considered challenges to random drug testing programs under the Fourth Amendment and parallel state constitutional provisions have generally upheld the testing of armed police officers as consistent with the decisions of the Supreme Court. For example, in *National Federation of Federal Employees v. Cheney,* 884 *F.*2d 603, 612–13 (D.C.Cir. 1989), *cert. denied,* 493 *U.S.* 1056, 110 *S.Ct.* 864, 107 *L.Ed.*2d 948 (1990), the D.C. Circuit sustained, under the Federal Constitution, the Army's random testing of armed police and security guards among others, because of their use of and accessibility to weapons, the dangerous workplace setting, and the highly regulated nature of their positions. And, in *Guiney v. Roache,* 873 *F.*2d 1557, 1558 (1st Cir.), *cert. denied,* 493 *U.S.* 963, 110 *S.Ct.* 404, 107 *L.Ed.*2d 370 (1989), the First Circuit approved random testing of police officers under the Fourth Amendment because, like the customs employees in *Von Raab,* police officers carry firearms and participate in drug interdiction. The Supreme Court of Hawaii, analyzing random testing of police officers under a state constitutional provision similar to New Jersey's Article I, Paragraph 7, has reached the same result. *McCloskey v. Honolulu Police Dep't,* 71 *Haw.* 568, 799 *P.*2d 953, 958–59 (1990). Hawaii's high court relied on the police officers' diminished expectations of privacy and on its finding that the "testing program [was] not more intrusive than needed" to uphold the Honolulu Police Department's random testing program. *Id.* 799 *P.*2d at 958–59. *But see Guiney v. Police Comm'r of Boston,* 411 *Mass.* 328, 582 *N.E.*2d 523, 526 (1991) (holding Boston Police Department's random drug testing program unconstitutional under state constitution because "body searches" cannot be justified by "some generalized sense that there is a drug problem ... and that random urinalyses of police officers will solve, or at least help to solve, the problem or its consequences").

### -D-

■ The PBA argues that the special needs test is not compatible with Article 1, Paragraph 7 of the New Jersey Constitution

which this Court has read to provide greater protection than is provided by its federal counterpart. In cases presenting an issue implicating Fourth Amendment and Article I, Paragraph 7 rights, this Court has considered whether our State Constitution is to be interpreted more expansively "than may be required by the [United States] Supreme Court's prevailing interpretation of the Fourth Amendment." *State v. Bruzzese,* 94 *N.J.* 210, 216, 463 *A.*2d 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984). We have, in certain circumstances, found that Article 1, Paragraph 7 affords greater protection against unreasonable searches and seizures than does the Federal Constitution. *See, e.g., State v. Pierce,* 136 *N.J.* 184, 208–15, 642 *A.*2d 947 (1994) (holding that vehicular search incident to arrest for traffic offense is unreasonable under State Constitution); *Hempele, supra,* 120 *N.J.* at 200–15, 576 *A.*2d 793 (finding that state constitution protects reasonable expectation of privacy in garbage left at curbside); *State v. Novembrino,* 105 *N.J.* 95, 157–58, 519 *A.*2d 820 (1987) (refusing to adopt good-faith exception under state constitution); *State v. Hunt,* 91 *N.J.* 338, 344–47, 450 *A.*2d 952 (1982) (holding that state constitution protects privacy interests in telephone toll billing records); *State v. Alston,* 88 *N.J.* 211, 228, 440 *A.*2d 1311 (1981) (finding more liberal criteria for standing to challenge validity of search under state constitution); *State v. Johnson,* 68 *N.J.* 349, 353–54, 346 *A.*2d 66 (1975) (imposing heavier burden on State to show validity of non-custodial consent to search under state constitution). These examples demonstrate that New Jersey has taken a more limited view of the traditional exceptions to the warrant requirement.

We find that the special needs test provides a useful analytical framework for considering the protections afforded by Article I, Paragraph 7 of the New Jersey Constitution and adopt this approach in our review of NJ Transit's drug testing program. This approach enables a court to take into account the complex factors relevant in each case and to balance those factors in such manner as to ensure that the right against unreasonable searches and seizures is adequately protected. *See Chandler, supra,* 520

*U.S.* at ——, 117 *S.Ct.* at 1305, 137 *L.Ed.*2d at 529 (refusing to sustain "suspicionless search, no matter how conveniently arranged," where "public safety is not genuinely in jeopardy"). Although, until today, we have not had occasion to apply special needs balancing to a random drug testing program, we have recognized the validity of this approach under Article 1, Paragraph 7. *See O'Keefe, supra,* 132 *N.J.* at 242, 624 *A.*2d 578; *Hempele, supra,* 120 *N.J.* at 218, 576 *A.*2d 793. In *Hempele,* the Court explained:

> Once the protections of article 1, paragraph 7 apply, a lower expectation of privacy is not a sufficient basis on which to carve out an exception to the warrant and probable-cause requirement. We can dispense with that requirement "[o]nly in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable...." If a "special need" does exist, we can then make an exception to the requirement only after we "balance the nature and quality of the intrusion on the individual's [article 1, paragraph 7] interests against the importance of the governmental interests alleged to justify the intrusion."
>
> [120 *N.J.* at 218, 576 *A.*2d 793 (alterations in original) (citations omitted).]

In the context of a warrantless search of garbage, the Court determined that a suspicionless search could not be sustained. *Id.* at 221, 576 *A.*2d 793. In effect, the government had failed to establish a special need "because the purpose of the garbage searches was enforcement of the drug laws, not of garbage regulations." *Id.* at 219, 576 *A.*2d 793.

The Court also discussed the special needs approach in *O'Keefe, supra.* *O'Keefe* involved a constitutional challenge to the Passaic Valley Water Commission's policy requiring applicants for employment to submit to a drug test. 132 *N.J.* at 236, 624 *A.*2d 578. O'Keefe, an unsuccessful applicant, claimed that he was not hired because he refused to comply with the drug testing policy. *Ibid.* The Court found that the Commission had rejected O'Keefe for reasons unrelated to his refusal to take the drug test, and did not reach the constitutional issue. *Id.* at 236–37, 624 *A.*2d 578. Nevertheless, the Court stated:

> An analysis of the Fourth Amendment to the United States Constitution *or article one, paragraph seven of the New Jersey Constitution* initially poses the question

whether an employer has a "special ... need[ ] beyond the normal need for law enforcement" to test applicants.

[*Id.* at 242, 624 *A*.2d 578 (citation omitted) (emphasis added).]

*See also Hennessey, supra,* 129 *N.J.* at 99–108, 609 *A.*2d 11 (applying balancing approach to drug testing of oil refinery employees).

Although these cases indicate our agreement with the United States Supreme Court's special needs analysis, PBA encourages us to follow *FOP, supra.* *FOP,* which was decided prior to *Skinner* and *Von Raab,* struck down random drug testing of narcotics bureau officers by the Newark Police Department under Article 1, Paragraph 7. 216 *N.J.Super.* at 474–78, 524 *A.*2d 430. In reaching this result, the court rejected the city's contention that police officers are members of a highly regulated industry, *id.* at 469, 524 *A.*2d 430, and relied on the absence of a factual showing that drug use was widespread among narcotics officers. *Id.* at 474, 524 *A.*2d 430. Cases decided since *FOP* call into question the continued validity of its holding. To the extent that *FOP* is inconsistent with the special needs test we adopt today, it is overruled.

## III

### -A-

■ We turn now to the question whether, under Article 1, Paragraph 7, NJ Transit's random drug testing program "ranks among the limited circumstances in which suspicionless searches are warranted." *Chandler, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1298, 137 *L.Ed.*2d at 519. First, we consider the Agency's claim that there exists a special governmental need that justifies testing without individualized suspicion. Critical to the issue of whether a special need exists is the purpose of NJ Transit's random drug testing program, which "is to ensure that [the Agency] operates in the safest and most efficient manner possible and to promote the safety and welfare of [its] employees and customers." *Core Policy* § I. By making random testing applicable only to those employees

who perform safety-sensitive functions, *Addendum I* tailors NJ Transit's testing program to its purpose.

The record demonstrates that transit officers ride the rails and perform patrol and investigatory police duties at NJ Transit terminals and locations throughout the state. The officers perform these duties independently, and are not subject "to the kind of day-to-day scrutiny that is the norm in more traditional office environments," making drug detection based on observation difficult, if not impossible. *Von Raab, supra,* 489 *U.S.* at 674, 109 *S.Ct.* at 1395, 103 *L.Ed.*2d at 707. In these circumstances, requiring the Agency to comply with the individualized suspicion standard would be impractical. Such a requirement would also compromise the Agency's safety objectives because officers who are drug impaired could "cause great human loss before any signs of impairment become noticeable to supervisors or others." *Skinner, supra,* 489 *U.S.* at 628, 109 *S.Ct.* at 1419, 103 *L.Ed.*2d at 667. Because NJ Transit's testing policy is designed to promote public safety and not to serve law enforcement needs, the Agency's substantial interest in protecting its employees and the public presents a special need that may "justif[y] the privacy intrusions at issue absent ... individualized suspicion." *Id.* at 621, 109 *S.Ct.* at 1415, 103 *L.Ed.*2d at 662–63.

## -B-

Our next step, then, is to "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1303, 137 *L.Ed.*2d at 526. We begin with the privacy interests of the transit officers subject to testing. Urine testing, although "not invasive of the body," is certainly an intrusion on privacy both during collection of the sample and when the sample is tested. *Skinner, supra,* 489 *U.S.* at 626–27, 109 *S.Ct.* at 1418–19, 103 *L.Ed.*2d at 665–66. The collection process constitutes an intrusion because it requires an employee, at the request of another, to "perform an excretory function traditionally shielded

by great privacy". *Id.* at 626, 109 *S.Ct.* at 1418, 103 *L.Ed.*2d at 655. The subsequent "chemical analysis of the sample to obtain physiological data is a further invasion of the tested [employee's] privacy interests," *id.* at 616, 109 *S.Ct.* at 1413, 103 *L.Ed.*2d at 659, as is the potential for dissemination of the test results and any medical information obtained through testing. *See State ex rel. J.G.*, 151 *N.J.* 565, 586–588, 701 *A.*2d 1265 (1997). NJ Transit's testing procedures are designed to address these privacy concerns and to minimize the intrusion on the employee's privacy.

Toward this end, the procedures require the urine sample to be collected in a manner that ensures the modesty and privacy of transit employees. The collection site must permit individual privacy while a specimen is produced. *Core Policy* § IX.F. Only when the employer has reason to believe that the employee may adulterate the sample, and only after review and approval by a supervisor, may another person of the same gender as the employee observe the employee produce a specimen. To ensure the accuracy of the urinalysis, samples are tested at a laboratory certified by the DHHS. Samples that test positive for the designated substances are analyzed a second time to guard against false positive results and must be verified by the MRO, who is responsible for examining possible alternative medical explanations. Employees who test positive have the right to have a third test performed by the DHHS-certified laboratory of their choice. *See supra* at 538–540, 701 *A.*2d at 1251–1252.

NJ Transit's policy and the FTA's regulations also protect employees' privacy interests by specifically listing the substances for which samples will be tested and by requiring FTA approval for additional testing. *Core Policy* § IX.A; 49 *C.F.R.* § 40.21(b). Any other analysis of urine specimens is expressly prohibited by federal regulation. *Id.* § 40.21(c). Pursuant to federal mandate, NJ Transit cannot compel the employee to provide information about prescription medication or other medical conditions. *Id.* §§ 40.23(a), 40.33(b)–(c). In addition, employees' records must be

kept confidential and are reported only to the appropriate management official and the employee, except in certain limited circumstances or "as required by law." *Id.* § 653.75; *see also Core Policy* § XIII; *Addendum I* § XIII.

One exception to the disclosure limitations is found only in NJ Transit's *Addendum I.* Based on the Agency's interpretation of the Attorney General's *Guidelines, see supra* at 540, 701 *A.*2d at 1252, the Division of State Police keeps records of transit officers' positive test results, which can be obtained "only through court order or as part of a confidential investigation related to law enforcement employment." *Addendum I* § XIII.A.1. The officers' positive results are also reported to the county prosecutor. *Ibid.* We leave to the Attorney General to clarify his intent in respect of such disclosure, noting only that the release of information required to be kept by federal rule, including the results of *all* drug testing, *see* 49 *C.F.R.* § 653.71, is precluded except as set forth in 49 *C.F.R.* § 653.75. In asking the Attorney General to revisit the disclosure question, we do not suggest that NJ Transit's program is in any way designed to effectuate law enforcement purposes.

■ We find that NJ Transit's drug testing program, as designed, limits the intrusion on transit officers' privacy interests, and now consider the nature of those interests. In the heavily regulated rail and mass transportation industries, safety depends on the health and fitness of covered employees. *See Skinner, supra,* 489 *U.S.* at 627, 109 *S.Ct.* at 1418, 103 *L.Ed.*2d at 666. Like other such employees and, most important, because of their law enforcement status, transit police officers have a diminished expectation of privacy. *Rawlings, supra,* 133 *N.J.* at 189–90, 627 *A.*2d 602. Transit officers exercise traditional police powers and duties, and are subject to the rules and regulations governing police conduct. *See N.J.S.A.* 27:25–15.1. They are permitted to carry firearms and to " 'exercis[e] the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them.' " *Rawlings, supra,* 133 *N.J.* at 189, 627 *A.*2d 602 (quoting

*PBA Local 318, supra,* 850 *F.*2d at 141) (alteration in original). At any time, whether on a crowded station platform or on a moving train, they may be called on to exercise discretion in the use of a weapon. At that moment, the officer's judgment is critical. Given the nature of their responsibilities, transit officers, "[u]nlike most private citizens or government employees in general, ... should expect an effective inquiry into their fitness and probity." *Von Raab, supra,* 489 *U.S.* at 672, 109 *S.Ct.* at 1394, 103 *L.Ed.*2d at 706; *see also Rawlings, supra,* 133 *N.J.* at 189–90, 627 *A.*2d 602. For these reasons, we find that the proposed testing "pose[s] only [a] limited threat[ ] to the justifiable expectations of privacy" of transit police officers. *Skinner, supra,* 489 *U.S.* at 628, 109 *S.Ct* at 1420, 103 *L.Ed.*2d at 667.

■ The government's interest in conducting random drug testing of employees who carry firearms for security purposes is substantial. Transit police officers are subject to testing because they perform a safety-sensitive function under the terms of *Addendum I.* If armed transit officers perform their duties under the influence of drugs, the potential for harmful consequences is considerable. The FTA recognized this potential when it included employees who carry firearms for security purposes as a "safety-sensitive" category in the 1994 regulations. The FTA notice accompanying the regulations stated that "firearm-bearing police and security personnel [were included] because of the sensitivity of their position and the danger to the public should they be under the influence of prohibited drugs." Prevention of Prohibited Drug Use in Transit Operations, 59 *Fed.Reg.* 7572, 7575 (1994).

In *Rawlings, supra,* we observed that "[t]he threat to public safety of a police officer acting under the influence of drugs is 'manifest.'" 133 *N.J.* at 189, 627 *A.*2d 602 (citation omitted). Although use of a weapon by a drug impaired police officer could cause great harm in any case, the fact that a significant number of transit officers patrol the state's main transportation terminals, through which thousands of passengers pass daily, is cause for particular concern. Here, as in *Von Raab,* officers "who may use

deadly force plainly 'discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.' " *Von Raab, supra,* 489 *U.S.* at 670, 109 *S.Ct.* at 1393, 103 *L.Ed.*2d at 705 (quoting *Skinner, supra,* 489 *U.S.* at 628, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 667); *see Rawlings, supra,* 133 *N.J.* at 189, 627 *A.*2d 602.

The concerns about illegal drug use by police officers are not simply hypothetical. We were informed at oral argument that preemployment and random drug testing of trainees at the State Police Academy and reasonable suspicion testing of police officers under the Attorney General's *Guidelines* show a statewide positive rate of about four percent. Available information indicates that police departments generally have not been immune from the drug use that has affected other workplaces. *See* Joseph F. Dietrich & Janette Smith, *The Nonmedical Use of Drugs Including Alcohol Among Police Personnel: A Critical Literature Review,* 14 *J. Police Science & Admin.* 300, 300–03 (1986). Moreover, drug use is difficult to address because officers frequently function away from their supervisors and are exposed to illegal drug activity. *Id.* at 302–03.

That transit police officers often carry out their duties independently of their superiors and do not work in an office environment where drug use would be more readily observable strengthens the government's interest in random testing. This may explain why NJ Transit has documented only two incidents of drug use by officers in recent years: in 1991 one officer tested positive for cocaine and pled guilty to altering a painkiller prescription and, in 1995, following a reasonable suspicion test, an officer was discharged when he tested positive for cocaine, marijuana, an opiate and morphine. As discussed previously, *see supra* at 554, 701 *A.*2d at 1259, in *Chandler, supra,* the Court found "a telling difference between [the customs officials tested in] *Von Raab* and Georgia's candidate drug-testing program," because "[i]n *Von Raab* it was 'not feasible to subject employees [required to carry firearms] . . . to the kind of day-to-day scrutiny that is the norm in

more traditional office environments.'" *Chandler, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1304, 137 *L.Ed.*2d at 527 (quoting *Von Raab, supra,* 489 *U.S.* at 674, 109 *S.Ct.* at 1395, 103 *L.Ed.*2d at 707) (alteration in original). Precisely for the same reasons as in *Von Raab,* it would be difficult to detect any drug impairment of transit officers. The impracticality of detection based on daily observation means that suspicion-based testing is not likely to be effective in deterring drug use, and that reliance on individualized suspicion alone would compromise the Agency's safety objectives.

The government also has a compelling interest in ensuring that its drug enforcement authorities are themselves drug-free. We give less emphasis to this interest because it is not clear from the record the extent to which transit officers are actively involved in drug interdiction efforts. The PBA has stated that some transit officers participate in a drug interdiction task force with the Essex County Sheriff's Department. We note, also, that transit officers have "general authority, without limitation, to exercise police powers and duties, as provided by law for police officers and law enforcement officers, in all criminal and traffic matters at all times throughout the State." *N.J.S.A.* 27:25–15.1. Insofar as the officers are responsible for enforcing the state's drug laws, it is in the public interest to prevent those who use drugs from carrying out drug interdiction duties. *See Von Raab, supra,* 489 *U.S.* at 669, 109 *S.Ct.* at 1393, 103 *L.Ed.*2d at 704–05.

The United States Supreme Court found nearly identical governmental interests compelling in *Von Raab.* While we acknowledge that *Von Raab* was "[h]ardly a decision opening broad vistas for suspicionless searches" and "must be read in its unique context," *Chandler, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1304, 137 *L.Ed.*2d at 527, we find the random drug testing of NJ Transit police officers to raise essentially the same concerns as the testing of customs officers who carry firearms.

## -IV-

■ Having considered the transit police officers' decreased expectation of privacy, the adequate limitations on the obtrusive-

ness of the testing, and the compelling state interest in promoting safe conduct by armed officers, we hold that random drug testing of NJ Transit's police force is constitutional under Article 1, Paragraph 7 of the New Jersey Constitution.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.