**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-1340
_____

DAVID MOLLO,
Appellant

v.

PASSAIC VALLEY SEWERAGE COMMISSIONERS;
ANTHONY W. ARDIS; FRAN J. CALANDIELLO;
ALAN C. LEVINE; ANTHONY J. LUNA;
ANGELINA M. PASERCHIA; KENNETH R. PENGITORE;
THOMAS POWELL
Appellees

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 07-cv-01655)
District Judge:  Honorable Dickinson R. Debevoise

_____

Submitted Under Third Circuit LAR 34.1(a)
January 11, 2011

_____

Before: SCIRICA, BARRY and VANASKIE, Circuit Judges

(Opinion Filed: January 20, 2011)

_____

OPINION
_____

BARRY, Circuit Judge

David Mollo was terminated from his landscaping position with the Passaic Valley

Sewerage Commissioners (PVSC) after failing a drug test administered pursuant to a new random testing policy applicable to all PVSC employees engaged in "safety sensitive" work at its Newark, New Jersey treatment plant. Mollo challenged his termination as violating, *inter alia*, his right to be free from unreasonable searches and seizures pursuant to state and federal constitutional law. His suit was removed to federal court, after which PVSC moved for, and was granted, summary judgment. He now appeals the District Court's conclusions that: (1) the New Jersey Constitution does not prohibit the random, suspicionless drug testing policy to which he was subject; (2) PVSC's policy did not violate federal law; and (3) summary judgment was proper. We will affirm.

## I. Background

Writing solely for the parties, we discuss only those facts relevant to our analysis.

PVSC was created by state statute in 1902 to manage and regulate wastewater collection and disposal for four counties in northern New Jersey. *See* N.J.S.A. 58:14-1. PVSC's sprawling Newark treatment plant processes 330 million gallons of wastewater each day, and is comprised of miles of access roads, utility tunnels, and process pipes. Dangers inherent to the plant include its use and storage of combustible and/or hazardous chemicals, the presence in confined spaces of poisonous air generated by treatment processes, and the presence of a cryogenic plant, a high-voltage electrical substation, Archimedes screw pumps, and walkways from which an inattentive person can fall into clarifiers that hold raw sewage. Accidents arising from any of these hazards risk causing

2

injury or death to persons in the vicinity, damage to the plant, and/or service interruption to PVSC's 1.3 million customers. PVSC is subject to regular Occupational Safety and Health Administration (OSHA) inspection, as well as other regulations.

Mollo began employment with PVSC in June of 2002 as a maintenance worker, and in 2005 he was promoted to a landscaping position. He characterizes his work as that of a "weed whacker," although the record indicates that his job involved landscaping and snow removal duties throughout the PVSC treatment plant, requiring that he use vehicles and motorized equipment and be available for work on a 24-hour basis. Sometimes he worked alone, other times as part of a supervised team. During the course of his employment, he underwent safety training programs addressing, e.g., hazardous substances, emergency preparedness, fire prevention, and use of a device for measuring airborne toxins. His job description included a provision requiring that he be in good health and free from disabilities or defects that might impair his performance or compromise his or others' health and safety. His employment also was governed by personnel policies and procedures pursuant to which PVSC could, with reasonable cause, direct him to undergo medical testing for controlled substance use.

In July of 2005, based on anonymous, verbal reports of drug and alcohol use among PVSC facility employees, and after consultation among facility supervisors, human resources staff, and legal counsel, the Commissioners adopted a policy pursuant to which employees whose work was deemed to be "safety sensitive" were subject to

3

random drug testing. Falling within that category were employees, like Mollo, who worked near operating equipment and machinery. All eligible employees would be tested during the program's first year, beginning September 1, 2005, after which 50% would be tested annually. The record indicates that "[t]he stated purpose of the policy was to maintain a drug-free workplace … to create a safe working environment free from the effects of drugs … [and] to promote and maintain the safety of the public and PVSC employees." App. at 8 (internal quotation marks and citation omitted).[1] Because Mollo was on leave when the new policy was announced, he received a copy upon his return to work on September 29, and was ordered to submit to testing or face termination. Mollo signed an acknowledgement of his receipt of the new policy's provisions, produced a urine sample, and tested positive for marijuana, cocaine, and PCP.

Mollo did not dispute the test results, and was suspended from work. On October 20, he elected to sign a stipulation admitting guilt, at which point he was allowed to return to work on a probationary basis provided he enter a PVSC-sponsored treatment program. The stipulation provided that a subsequent positive test, refusal to be tested, or refusal to follow PVSC directives would result in termination. On October 31, Mollo enrolled and began participating in a PVSC-recommended outpatient substance abuse treatment

---

[1] The record includes depositions averring that PVSC's new drug testing program was adopted because drug use contravened its commitment to safety: "We have a very dangerous facility[,]" PVSC's executive director testified. App. at 297. PVSC employs a staff of approximately ten persons who oversee safety full-time. When it developed its random drug testing policy, PVSC also was part of a Department of Homeland Security assessment program that spurred it "to review security in general." *Id.* at 275.

program. On November 2, he returned to work, PVSC administered another drug and alcohol test, and Mollo tested positive for cocaine. He was informed via letter dated November 7, 2005, that he was indefinitely suspended and subject to immediate termination. Mollo was given the opportunity to attend a meeting on December 14 at which the Commissioners would address his case. He did not attend, and the Commissioners terminated his employment effective December 15, 2005.

On February 26, 2007, Mollo filed this case against PVSC and several named individuals, challenging his termination on the grounds that, *inter alia*, PVSC's policy permitted an unreasonable search and seizure in violation of Article I, Par. 7 of the New Jersey Constitution and, pursuant to 42 U.S.C. §§ 1983, 1985, and 1988, the Fourth and Fourteenth Amendments to the United States Constitution. After the case was removed to federal court, discovery ensued, and defendants subsequently filed a motion for summary judgment. On the basis, in part, of affidavits filed by three PVSC officials attesting to the safety-sensitive nature of Mollo's work, the District Court granted defendants' motion on December 30, 2009, and this appeal followed.

## II. Discussion

The District Court exercised jurisdiction under 28 U.S.C. §§ 1331 and 1367. We exercise jurisdiction under 28 U.S.C. § 1291.[2]

---

[2] We note, as a preliminary matter, that PVSC raised a defense of qualified immunity before the District Court. In a footnote to its opinion granting summary judgment to PVSC, the Court concluded that even if it "had found that Mollo's expectation of privacy outweighed the government's interest in suspicionless drug testing, the Commissioners

5

A district court's grant of summary judgment is subject to plenary review. *Pearson v. Component Technology Corp.*, 247 F.3d 471, 482 (3d Cir. 2001). At the summary judgment stage, a court views the facts in the light most favorable to the non-moving party, and "the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* at 482 n.1 (citations omitted). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citation omitted). That is, "when the moving party has pointed to material facts tending to show there is no genuine issue for trial, the 'opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Objecting to the basis upon which PVSC instituted its suspicionless, random drug testing policy and defined his job as safety-sensitive, Mollo argues that the District Court erred in concluding that the nature of his job and PVSC's status as a regulated industry subjected him to a diminished expectation of privacy that justified its policy.

A *prima facie* case under 42 U.S.C. § 1983 requires showing that a person acting

would have been entitled to qualified immunity." App. at 25 n.9. PVSC does not take issue with this conclusion in its brief on appeal, and we do not address it further.

6

under color of state law deprived a plaintiff of a federal right.[3]  As the District Court noted, there is no question that the Commissioners were acting under color of state law. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 935 n.18 (1982) ("state employment is generally sufficient to render the defendant a state actor").  As to Mollo's state constitutional claim, Article I, Paragraph 7 of the New Jersey Constitution employs almost identical language as that which appears in the Fourth Amendment to the United States Constitution.[4]  This case thus turns on whether PVSC's termination of Mollo after he failed a randomly administered, suspicionless drug test, unlawfully deprived him of the right to be free from unreasonable searches and seizures by government authorities, including via the collection and testing of an employee's urine.  *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616, 619 (1989); *New Jersey Transit PBA Local 304 v. New Jersey Transit Corp.*, 151 N.J. 531, 543 (1997).

In *United States v. Sczubelek*, we stated that

> [d]etermining whether a search is reasonable depends on all

---

[3] The District Court noted that Mollo did not set forth his claims under §§ 1985 and 1988 with any specificity, nor did he develop them in his papers in opposition to summary judgment.  Accordingly, the Court properly granted summary judgment in favor of defendants as to those claims, and we reject his attempt to press a § 1988 claim before us.

[4] *See* U.S. Const. Amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); N.J. Const. Art. I, par. 7 ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.").

of the circumstances surrounding the search or seizure and the nature of the search or seizure itself, and involves balancing[,] on the one hand, the degree to which the search intrudes upon an individual's privacy and, on the other hand, the degree to which the search is needed for the promotion of legitimate governmental interests.

402 F.3d 175, 182 (3d Cir. 2005) (internal quotation marks and alterations omitted; citing *United States v. Knights*, 534 U.S. 112, 118, 119 (2001), and *Skinner*, 489 U.S. at 619). Accordingly, suspicionless drug testing of public employees can be permissible under such a balancing test where it "serves special governmental needs[] beyond the normal need for law enforcement[.]" *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989). While the New Jersey Constitution has been interpreted as providing greater protection than the Fourth Amendment in some respects, the Supreme Court of New Jersey has applied the matrix of rules derived from *Skinner* and *Von Raab* to allow suspicionless drug testing of public employees upon a showing of a diminished expectation of privacy, adequate limitations on the testing's intrusiveness, and a compelling government interest in the employees' safe conduct. *PBA Local 304*, 151 N.J. at 544, 545, 556.

In light of the *Skinner/Von Raab* line of cases, we conclude that the District Court did not err. *Skinner* concluded that suspicionless drug and alcohol testing of railroad employees involved in certain train accidents or who violated certain safety rules was reasonable because the government's compelling interest outweighed employees' diminished expectations of privacy "by reason of their participation in an industry that is

8

regulated pervasively to ensure safety[.]" 489 U.S. at 627. *Skinner* emphasized that the railroad employees "discharge[d] duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Id.* at 628.

Whether PVSC is "regulated pervasively" is arguably a matter for debate—but more along the lines of "metaphysical doubt" than arguable debate that bars summary judgment. *See Rossi*, 156 F.3d at 466. At a minimum, the evidence before the District Court demonstrated that PVSC was subject to consistent regulatory oversight by OSHA. Moreover, both this Court and the Supreme Court of New Jersey have made clear that the characteristic of pervasive regulation is not the *sine qua non* of establishing a diminished expectation of privacy. In *Wilcher v. City of Wilmington*, we observed that

> [e]ven though extensive regulation of an industry may diminish an employee's expectation of privacy, we have never held that regulation alone is the sole factor that determines the scope of an employee's expectation of privacy. It is also the safety concerns associated with a particular type of employment—especially those concerns that are well-known to prospective employees—which diminish an employee's expectation of privacy.

139 F.3d 366, 374 (3d Cir. 1998) (internal citations omitted). S*ee also PBA Local 304*, 151 N.J. at 546-47 (noting that cases putatively turning on the decisiveness of the pervasive regulation criterion pre-dated *Skinner/Von Raab*).

Here, PVSC demonstrated that Mollo was aware of the safety concerns inherent in work at its treatment plant and, as an entity, PVSC clearly satisfies *PBA Local 304*'s alternative criterion of a "long tradition of close government supervision." 151 N.J. at

9

545 (internal quotation marks and citation omitted). Taking these facts together, Mollo had a diminished expectation of privacy. His duties, though those of a self-described "weed-whacker," were safety-sensitive: they either required, or could have required, that he engage in tasks—such as the operation of machinery in dangerous places and the use of tools meant to detect whether he and other workers safely could enter certain, possibly dangerous, airspaces—the discharge of which were fraught with risks of serious injury.[5]

Although Mollo's PVSC landscaping position clearly did not involve tasks such as drug interdiction or bearing firearms, it is instructive that although *Von Raab* sustained suspicionless drug testing of customs employees charged with such tasks, *Von Raab* did so on the premise that their "successful performance of their duties depend[ed] uniquely on their judgment and dexterity[.]" 489 U.S. at 672, 674. Thus, just as specifically delineated security interests outweighed the customs employees' diminished expectations of privacy in *Von Raab*, uncontroverted evidence that PVSC presented to the District Court makes clear that persons in Mollo's position who are under the influence of alcohol or drugs not only could fail to exercise the judgment and dexterity required of them, but in so failing, could cause significant damage to the PVSC plant and/or serious if not life-threatening harm to themselves and others.

---

[5] *See also Policeman's Benevolent Ass'n, Local 318 v. Washington Twp.*, 850 F.2d 133, 135 (3d Cir. 1988) (upholding random drug testing of police officers given the pervasive regulation, and also sensitive nature, of their work); *Transport Workers' Union of Philadelphia, Local 234 v. Southeastern Pennsylvania Transp. Auth.*, 884 F.2d 709, 711-12 (3d Cir. 1989) (upholding random drug testing of operating employees given

Moreover, although PVSC had not documented a specific drug problem among its employees, it implemented its policy only after hearing reports of such problems and engaging in a deliberative process to identify which work positions were safety-sensitive. *Compare Bolden*, 953 F.2d at 823-24 (rejecting random drug testing of train depot custodian whose position had not been deemed safety-sensitive, listed in the agency's drug testing policy, or shown to be unusually dangerous). We bear in mind that *Von Raab* was "[h]ardly a decision opening broad vistas for suspicionless searches[.]" *Chandler v. Miller*, 520 U.S. 305, 321 (1997) (striking down law requiring certification of negative drug tests by candidates for certain state offices). But nor did PVSC have an absence of evidence of drug problems among its employees, nor were they employees who "typically do not perform high-risk, safety-sensitive tasks[.]" *Id.* at 322.

*PBA Local 304* makes clear that Mollo's claim under New Jersey law also fails. Applying the *Skinner/Von Raab* line of cases to the question of whether, under Article I, Paragraph 7 of the New Jersey Constitution, armed transit police, by virtue of their safety-sensitive positions, could be subject to random, suspicionless testing for substance abuse, the Supreme Court of New Jersey concluded that they could: (1) the employees were not subject to the day-to-day scrutiny that is normal in traditional office environments; (2) the testing policy arose from the transit agency's legitimate safety objectives; (3) the nature of the testing procedures addressed privacy concerns; (4) the transit industry is heavily

---

evidence of serious safety hazards caused by employee drug use, and the policy's application only to employees in safety-sensitive jobs).

regulated, with safety dependent on covered employees' health and fitness; (5) covered employees' duties were fraught with risks of injury to others, such that even momentary lapse of attention could have disastrous consequences; and (6) the agency's concerns about drug use were not merely hypothetical. *PBA Local 304*, 151 N.J. at 558-63 (quotation marks and citations omitted). While it is true that Mollo's position did not involve bearing firearms, the test, at bottom, is one of reasonableness, and that involves balancing. And, as PVSC has shown, Mollo was often unsupervised, PVSC is a regulated entity with legitimate, documented safety concerns, and ensuring safety at its sprawling treatment plant requires the health and fitness of employees even in positions such as the one Mollo filled.

Finally, Mollo contends that the District Court "applied non-existent criteria and erroneously weighed and decided disputed facts to arrive at its decision[,] … rel[ying] on the certification of witnesses who should not have been credited[ because they] … were neither named in Rule 26 discovery [n]or in answers to interrogatories." Appellee's Br. at 9, 10. Under Rule 56, however, a court's conclusion that summary judgment is warranted *requires* that it assess facts—the point is whether it can resolve the legal dispute at issue on the undisputed material facts, construing all inferences in favor of the non-moving party. Here, the Court examined necessary factual questions such as PVSC's qualification as a regulated industry, its putative safety concerns, and the safety-sensitive nature of Mollo's employment position. Mollo offered scant evidence to rebut PVSC's

evidence. Evidence that he did offer suggested no more than a "metaphysical doubt" that a reasonable jury could have concluded that its own, different perceptions of these factual matters would have shifted the ultimate legal calculus concerning whether PVSC's testing policy was reasonable. And, we note, Mollo has not challenged as a factual matter the degree to which the policy's specific procedures impinged on privacy interests, and there is no evidence that they were insufficient in this respect. *See Wilcher*, 139 F.3d at 375.

### III. Conclusion

For the foregoing reasons, and finding Mollo's remaining arguments to be without merit, the order of the District Court will be affirmed.