SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**H.R. v. New Jersey State Parole Board (A-90-18) (082373)**

**Argued February 3, 2020 -- Decided June 1, 2020**

**LaVECCHIA, J., writing for the Court.**

The Sex Offender Monitoring Act (SOMA or the Act) requires that sex offenders designated as a high risk to reoffend -- specifically Tier III sex offenders under Megan's Law -- submit to continuous satellite-based monitoring. Plaintiff H.R. is a convicted sex offender. His sentence also included placement on parole supervision for life (PSL). When he was released from incarceration and designated as a Tier III sex offender, the Board required H.R. to submit to GPS monitoring. H.R. challenges the constitutionality of SOMA's GPS monitoring program as applied to him, claiming the monitoring constitutes an unreasonable warrantless search in violation of Article I, Paragraph 7 of the New Jersey Constitution. The Board counters that this search is valid because it falls within the "special needs" exception to the warrant requirement.

In 2010, H.R. was convicted of attempting to lure a minor into a motor vehicle. His incarceration ended in March 2015, but he remained subject to PSL as part of his sentence and, thus, was under the supervision of the Board. He was designated Tier III, or "high risk," under Megan's Law. Due to that tier designation, the Board imposed GPS monitoring as SOMA required. GPS monitoring permits the Board to track H.R.'s movements twenty-four hours per day, seven days per week, through an ankle bracelet device. According to H.R.'s deposition testimony, wearing the ankle bracelet causes him physical discomfort and has burdened his life in numerous ways. H.R. and another individual, I.R. -- who was not sentenced to PSL and had no additional parole requirements -- commenced this action in 2015, to challenge the constitutionality of the Board's imposition of GPS monitoring as applied to each of them.

The trial court held that the monitoring constituted a search under the New Jersey Constitution, relying on reasoning from Grady v. North Carolina, 575 U.S. 306 (2015). After applying the special needs balancing test, the court granted summary judgment to the Board as to H.R. but, noting the difference between H.R.'s PSL status and the facts in I.R.'s case, granted summary judgment in favor of I.R. On appeal, the Appellate Division affirmed as to both H.R. and I.R. 457 N.J. Super. 250, 255 (App. Div. 2018). The Board did not petition for certification in I.R.'s case; the Court granted H.R.'s petition for certification. 238 N.J. 495 (2019).

1

**HELD:**  SOMA's legislatively enumerated purposes demonstrate that a special need -- not an immediate need to gather evidence to pursue criminal charges -- motivates the GPS monitoring prescribed by the Legislature.  That satisfies the first step in a special needs analysis and allows the determination that this search may be constitutional.  The Court therefore balances the interests of the parties and concludes that, although GPS monitoring is a significantly invasive search, it is outweighed by the compelling government interest advanced by the search and H.R.'s severely diminished expectation of privacy.  The Court notes that H.R.'s PSL status is critical to that conclusion.

1.  SOMA was enacted in 2007 after the Legislature found enhanced monitoring to be efficacious following a two-year pilot program.  In the Act, the Legislature expresses concern about the high recidivism rates of sex offenders and the "unacceptable level of risk" such offenders pose to the community.  See N.J.S.A. 30:4-123.90(a).  SOMA declares that "[i]ntensive supervision" of such "offenders is a crucial element in both the rehabilitation of the released inmate and the safety of the surrounding community."  Id. at (b).  The Legislature called the GPS program "a valuable and reasonable requirement for those offenders who are determined to be a high risk to reoffend."  Id. at (e).  The Act provides that those whose "risk of reoffense has been determined to be high" -- defined as any person designated as a Tier III offender under Megan's Law -- are automatically subject to SOMA.  N.J.S.A. 30:4-123.91(a)(1).  And a person also sentenced to PSL must comply with both PSL and SOMA requirements.  N.J.A.C. 10A:72-11.5(b).  (pp. 12-16)

2.  The parties do not dispute that the GPS monitoring of H.R. constitutes a search for purposes of this constitutional challenge.  Any argument about that was abandoned after the trial court concluded it was a search, citing Grady.  There is also no dispute that H.R. was automatically subject to GPS monitoring because he was designated a Tier III sex offender under Megan's Law.  There was no individualized suspicion or warrant that preceded imposition of H.R.'s GPS monitoring.  Thus, for the search to be reasonable under Article I, Paragraph 7, it would have to fall within a well-delineated exception to the warrant requirement.  (pp. 16-17)

3.  In New Jersey, a warrant exception exists when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."  State v. O'Hagen, 189 N.J. 140, 150 (2007).  Under a special needs analysis, the first consideration is "whether there is a special governmental need beyond the normal need for law enforcement that justifies [the search] without individualized suspicion."  Id. at 158.  In that examination, courts look to the explanation for the search's purpose, ibid., and "if the core objective of the police conduct serves a special need other than immediate crime detection, the search may be constitutional," id. at 160.  Once the purpose of the search is determined to serve a special need, then a court weighs the search's encroachment on an individual's privacy interests against the advancement of legitimate state goals to determine whether, on balance, the search is reasonable.  See id. at 158.  The Court notes that the nature or degree of intrusiveness of the search is a

factor in the balancing performed in the second part of the analysis. Contrary to arguments advanced by H.R. and the ACLU, the first part of the test does not require a determination that the search is only minimally intrusive. (pp. 17-19)

4. Examination of the objective of a search performed under the auspices of a state statute begins "with the purposes enumerated by the Legislature." Id. at 158. The Court reviews the findings and declarations made in SOMA, noted in paragraph 1 above, and discerns from that plain and direct statutory language that the prime purpose of establishing SOMA's permanent program of continuous satellite monitoring is to enhance the State's supervision of sex offenders at high risk to reoffend. The Court holds that the legislatively enumerated purposes -- enhanced supervision, community protection, deterrence, and rehabilitation -- demonstrate that a special need -- not an immediate need to gather evidence to pursue criminal charges -- motivates the GPS monitoring prescribed by the Legislature. That satisfies the first step in a special needs analysis and allows the determination that this search may be constitutional. Id. at 160. (pp. 20-22)

5. Turning to the second part of the special needs test, the Court stresses that continuous GPS monitoring is more invasive than any special needs search allowed in the past, making the inquiry into the privacy interest affected a very important consideration. Here, H.R.'s status as a Tier III sex offender and a PSL parolee places him in the position of having a severely diminished expectation of privacy. The Court reviews the requirements to which H.R. is subject and notes the well-established principle that PSL parolees may be subjected to restrictions beyond what may ordinarily be constitutionally imposed. In light of those, the Court finds that H.R. has little to no expectation of privacy to assert. As to the governmental interest, the Court notes that the State's interest in deterring and preventing sexual offenses is compelling and well recognized but stresses that the strength of that interest still must be evaluated in context. (pp. 23-28)

6. On balance, H.R.'s diminished privacy interests as a Tier III Megan's Law sex offender on PSL are outweighed by the State's interest in deterring and rehabilitating him as a high-risk sex offender. The Court notes for comparison's sake only the different outcome reached by the trial court and the Appellate Division with respect to I.R., who was not on PSL. The Court stresses that this case presented exclusively an as-applied challenge to SOMA's imposition of GPS monitoring on H.R. immediately following his release from incarceration and being designated as Tier III; it did not entail any challenge to the time within which such monitoring is reviewed. A Megan's Law sex offender may file a motion for a change in tier designation based on a change in circumstances. (pp. 28-30)

**AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion.**

SUPREME COURT OF NEW JERSEY
A-90 September Term 2018
082373

H.R.,

Plaintiff-Appellant,

and

I.R.,

Plaintiff,

v.

The New Jersey State Parole Board,

Defendant-Respondent.

H.R.,

Plaintiff,

and

I.R.,

Plaintiff,

v.

The New Jersey State Parole Board,

Defendant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
457 N.J. Super. 250 (App. Div. 2018).

Argued                              Decided
February 3, 2020                    June 1, 2020

Fletcher C. Duddy, Deputy Public Defender, argued the
cause for appellant (Joseph E. Krakora, Public Defender,
attorney; Fletcher C. Duddy and Stephanie A. Lutz,
Assistant Deputy Public Defender, of counsel and on the
briefs).

Jane C. Schuster, Assistant Attorney General, argued the
cause for respondent (Gurbir S. Grewal, Attorney
General, attorney; Melissa H. Raksa, Assistant Attorney
General, of counsel, and Jane C. Schuster and
Christopher C. Josephson, Deputy Attorney General, on
the briefs).

Alexander Shalom argued the cause for amicus curiae
American Civil Liberties Union of New Jersey (American
Civil Liberties Union of New Jersey Foundation,
attorneys; Alexander Shalom and Jeanne LoCicero, on
the brief).

Brian D. Kenney argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Einhorn, Barbarito, Frost & Botwinick, attorneys; Brian
D. Kenney, on the brief).

JUSTICE LaVECCHIA delivered the opinion of the Court.

In 2007, the Legislature enacted the Sex Offender Monitoring Act

(SOMA or the Act), N.J.S.A. 30:4-123.89 to -123.99, declaring that

community protection, deterrence of recidivism, and rehabilitation would be promoted by enhanced supervision of high-risk sex offenders released into the community. SOMA requires that sex offenders designated as a high risk to reoffend -- specifically Tier III sex offenders under Megan's Law, see N.J.S.A. 2C:7-8(c)(3) -- submit to continuous satellite-based monitoring. N.J.S.A. 30:4-123.91(a)(1) and -123.92. The Act authorizes the New Jersey State Parole Board (the Board) to monitor a high-risk sex offender's location using an ankle device with Global Positioning System (GPS) technology. N.J.S.A. 30:4-123.92.

Plaintiff H.R. is a convicted sex offender. His sentence also included placement on parole supervision for life (PSL). See N.J.S.A. 2C:43-6.4. When he was released from incarceration and designated as a Tier III sex offender, the Board required H.R. to submit to GPS monitoring. He filed this action challenging the constitutionality of SOMA's GPS monitoring program as applied to him, claiming the monitoring violates his right to be free from unreasonable searches under Article I, Paragraph 7 of the New Jersey Constitution.

In this appeal we address H.R.'s contention that the requirement that he submit to GPS monitoring under SOMA constitutes an unreasonable warrantless search and the Board's countervailing argument that this search is

3

valid because it falls within the "special needs" exception to the warrant requirement. The Appellate Division, as well as the trial court, upheld the GPS monitoring of H.R. as a legitimate special needs search in this as applied challenge. We now affirm.

## I.

### A.

In 2010, H.R. was convicted of the offense of attempting to lure a minor into a motor vehicle. N.J.S.A. 2C:13-6. His incarceration ended in March 2015, but he remained subject to PSL as part of his sentence and, thus, was under the supervision of the Board. A tier classification hearing was conducted, and he was designated Tier III, or "high risk," under Megan's Law. See N.J.S.A. 2C:7-8(c). Due to that tier designation, the Board imposed GPS monitoring as SOMA required.

GPS monitoring permits the Board to track H.R.'s movements twenty-four hours per day, seven days per week, through an ankle bracelet device.

According to H.R.'s deposition testimony, wearing the ankle bracelet causes him physical discomfort including chafing, bleeding, open wounds, scarring on his foot and ankle, and numbness in his foot and toes. H.R. also testified about how the device has burdened his life. He described feeling humiliated and degraded wearing the device in public settings and how the

4

device causes him to feel ostracized. Due to the stigma of the device, he has not visited a doctor for medical issues; moreover, he feels that he cannot talk to others. Among other inconveniences, he explained that he must charge the ankle bracelet daily, which can take up to an hour, during which his movements are limited by an eight-foot electrical cord. When away from home, he must carry a battery pack, which he wears around his waist. If he fails to charge the device, an alarm will sound and the device will audibly remind him to recharge the battery. It may also state, "call your parole officer," or "are you out of the State?" Failure to recharge the battery can result in a violation and jail sentence.

H.R. and another individual commenced this action on April 24, 2015, to challenge the constitutionality of the Board's imposition of GPS monitoring as applied to each of them.[1] H.R. alleged that GPS monitoring violates Article I, Paragraph 7 of the New Jersey Constitution as an unreasonable search because it is conducted without a warrant and probable cause; he further claimed that because he is a parolee, he is entitled, at the very least, to a showing of reasonable articulable suspicion before he is subjected to a search. He also

---

[1] I.R. was the additional plaintiff in the complaint. The Board placed I.R. on GPS monitoring under SOMA following his release from confinement and designation as a Tier III offender. Unlike H.R., I.R. was not sentenced to PSL and had no additional parole requirements.

5

sought a preliminary injunction to enjoin the Board from continuing his GPS monitoring. The matter proceeded on cross motions for summary judgment -- for the relief sought and, on the Board's part, for dismissal of the action.

On January 25, 2017, the trial court issued an opinion holding first that the GPS monitoring constituted a search under Article I, Paragraph 7 of the New Jersey Constitution, relying on reasoning from Grady v. North Carolina, 575 U.S. 306 (2015), which held, under similar factual circumstances, that satellite-based monitoring constituted a search for Fourth Amendment purposes.

The court then addressed the Board's assertion that the search should be sustained as a special needs search. The court rejected H.R.'s argument that SOMA's purpose was law enforcement. The court reasoned that, "[w]hile the monitoring and the information obtained by the State may provide evidence that will assist in the prosecution of the offender, the monitoring is not intended to directly aid in the prosecution of the offender, but to prevent the commission of new crimes by sex offenders."

The court then applied the special needs balancing test to H.R.'s personal circumstances, weighing the "competing private and public interests advanced by the parties." (quoting State v. O'Hagen, 189 N.J. 140, 161 (2007)). The court recognized a significant intrusion on H.R.'s constitutional

6

right to personal liberty but concluded that, because H.R. is subject to PSL, his "expectation of privacy is already seriously diminished." The court determined that the governmental interests at work in SOMA outweighed the personal liberty invasions to which H.R. was subjected due to the GPS monitoring. Accordingly, the court granted summary judgment to the Board.[2]

B.

H.R. appealed.[3] The arguments on appeal focused on whether GPS monitoring was a special needs search and whether the trial court properly weighed the parties' respective interests. In light of the Supreme Court's decision in Grady, the parties no longer disputed that the GPS monitoring was a search.

The Appellate Division affirmed in a published decision. H.R. v. State Parole Bd., 457 N.J. Super. 250, 255 (App. Div. 2018). The Appellate Division first determined that, as a search, the GPS monitoring fit within the "special needs" exception to the warrant requirement. Id. at 260. The court

_____

[2] The court opinion noted the difference between H.R.'s PSL status and the facts in I.R.'s case. Because I.R. was not subject to any parole restrictions, the court concluded that SOMA's "punitive nature" and "intrusiveness" outweighed the Board's interest in subjecting I.R. to SOMA's GPS monitoring. The court therefore granted I.R.'s motion for summary judgment.

[3] The Board also filed an appeal from the judgment in I.R.'s favor. The Appellate Division consolidated the two appeals.

7

reviewed the Legislature's enumerated purposes for SOMA's required GPS monitoring, noting the deterrence and rehabilitation considerations cited in N.J.S.A. 30:4-123.90(b) and (c). Id. at 258-59. The court also was persuaded that a person is likely to be deterred from committing a crime when his or her actions are monitored through GPS and that avoiding criminal activity advances a person's rehabilitation. Id. at 259. The court further noted that GPS monitoring can exonerate an offender from a matter under investigation. Ibid. As a result of its analysis, the court concluded that H.R. could not demonstrate, either from "the statute's plain language or its actual enforcement, that the central purpose of the GPS monitoring is to assist in criminal investigations." Id. at 260.

Applying the special needs exception's balancing test, the Appellate Division concluded that the Board's interest in the prevention and deterrence of sexual offenses was significant. Id. at 261. Although the court recognized H.R. has a personal privacy interest that GPS monitoring "substantially diminishes," the Appellate Division's weighing of the interests hinged on H.R.'s PSL status. Id. at 261-63. The Appellate Division noted that being on PSL already diminishes H.R.'s privacy and personal autonomy because PSL subjects him to numerous restrictions, such as "polygraphs, curfews, travel restrictions . . . and searches of his home, vehicle[,] and person based on

8

reasonable suspicion." Id. at 263. On balance, the Appellate Division determined that the Board's interest outweighed H.R.'s privacy interest and upheld the GPS monitoring as a valid search under the special needs analysis.[4] Id. at 264.

We granted H.R.'s petition for certification. 238 N.J. 495 (2019).[5] We also granted amicus curiae status to the American Civil Liberties Union of New Jersey (ACLU) and the Association of Criminal Defense Lawyers of New Jersey (ACDL).

II.

A.

1.

H.R. distinguishes GPS monitoring from special needs searches allowed in the past. He argues that SOMA's plain language, as well as its actual use, makes the search's immediate objective evidence-gathering, which cannot be squared with a non-criminal purpose as required for the special needs exception to apply. Moreover, H.R. claims that allowing such monitoring is

---

[4] In contrast, with respect to I.R., the Appellate Division agreed with the motion court and found that I.R. had a greater expectation of privacy because, but for his SOMA requirements, he was not under the Board's supervision, and GPS monitoring constituted an unreasonable search as applied to him. H.R., 457 N.J. Super. at 263-64.

[5] The Board did not file a petition for certification in I.R.'s case.

9

incompatible with his rights as a parolee because the Board "must have reasonable suspicion of a parole violation before it may search [him]."

Assuming a special needs analysis is applicable, H.R. asserts that the GPS monitoring fails the balancing test. Calling GPS monitoring "a restrictive, invasive, painful, and shameful experience," he argues that the intrusion on his privacy is not minimal and "outweighs the State's interest in conducting the search." Although H.R. does not dispute that "preventing sex offender recidivism is a compelling governmental interest," he asserts that other existing mechanisms protect that interest and that "the incremental advancement that GPS surveillance provides in preventing [H.R.] from committing another crime is greatly outweighed by the burdens placed on him through the suspicionless search."

2.

The ACLU endorses H.R.'s arguments and homes in on the impropriety of extending the special needs exception beyond searches involving a minimal invasion of a privacy interest, calling that "a necessary precondition." It describes GPS monitoring as "among the most invasive searches imaginable," identifying and elaborating on "pain and humiliation, limitations on liberty, and invasions of privacy" as the types of burdens imposed on the monitored individual.

10

The ACDL similarly argues that GPS monitoring is unreasonable and should not be permitted under the special needs exception. According to the ACDL, every special needs search upheld to date in this state is distinguishable from the burdens imposed by GPS monitoring.

B.

The Board urges affirmance of H.R.'s GPS monitoring as a special needs search. It counters the claim that the purpose of GPS monitoring is evidence-gathering, pointing to the findings and declarations in SOMA that "continuous GPS monitoring of 'those offenders who are determined to be a high risk to reoffend' is both 'a valuable and reasonable requirement,'" (quoting N.J.S.A. 30:4-123.90(e)). The Board also points to SOMA's language about deterrence and rehabilitation, and its legislative history,[6] as demonstrating the legislative intent to protect the community, rendering incidental any law enforcement benefit.

Further, the Board argues that the Appellate Division correctly held that the special needs balancing test was satisfied in this case. The Board emphasizes that, because H.R. is subject to PSL and Megan's Law, he starts with "a reduced expectation of privacy." In terms of invasiveness of this

---

[6] Citing Pub. Hearing Before S. Law & Pub. Safety & Veterans' Affairs Comm. on S-484 (June 7, 2007); Pub. Hearing Before Assemb. Judiciary Comm. on A-1716 (May 21, 2007).

11

privacy intrusion, the Board distinguishes GPS monitoring of location from "full-blown search[es] of [a] person, home, and car, which require reasonable suspicion." When evaluated against the governmental interest involved, the Board disputes that H.R.'s current status as a PSL parolee and Tier III Megan's Law offender somehow lessens the weight to be attributed to the value of SOMA's GPS monitoring. In explaining the value of such monitoring, the Board relies on empirical data that had been presented to the Legislature and demonstrated that "in New Jersey, the electronic monitoring of our high-risk offenders is more effective than traditional parole supervision."[7] Thus, due to H.R.'s significantly reduced privacy interest, the Board contends that the balancing under the special needs test "tips heavily in favor of the State."

III.

SOMA was enacted on August 6, 2007, after the Legislature found enhanced monitoring to be efficacious following a two-year pilot program.

---

[7] The Board cites a report it provided the Legislature and Governor that "suggest[ed] the State Parole Board's GPS monitoring has contributed to a significantly lower recidivism rate than nationwide data indicates for high-risk sex offenders." State Parole Board, Report on New Jersey's GPS Monitoring of Sex Offenders (Dec. 5, 2007), https://ccoso.org/sites/default/files/import/nj-program.pdf. It points to other courts that have relied on similar empirical data on recidivism, citing Belleau v. Wall, 811 F.3d 929, 933 (7th. Cir. 2016).

12

L. 2005, c. 189 (N.J.S.A. 30:4-123.83).  The Act directs the Chairman of the State Parole Board (Chairman) to "establish a program for the continuous, satellite-based monitoring of sex offenders in this State."  N.J.S.A. 30:4-123.92(a).

When enacting SOMA as a permanent program, the Legislature made the following findings and declarations:

> a. Offenders who commit serious and violent sex crimes have demonstrated high recidivism rates and, according to some studies, are four to five times more likely to commit a new sex offense than those without such prior convictions, thereby posing an unacceptable level of risk to the community.
>
> b. Intensive supervision of serious and violent sex offenders is a crucial element in both the rehabilitation of the released inmate and the safety of the surrounding community.
>
> c. Technological solutions currently exist to provide improved supervision and behavioral control of sex offenders following their release.
>
> d. These solutions also provide law enforcement and correctional professionals with new tools for electronic correlation of the constantly updated geographic location of supervised sex offenders following their release with the geographic location of reported crimes, to possibly link released offenders to crimes or to exclude them from ongoing criminal investigations.
>
> e. Continuous 24 hours per day, seven days per week, monitoring is a valuable and reasonable requirement for

> those offenders who are determined to be a high risk to reoffend, were previously committed as sexually violent predators and conditionally discharged, or received or are serving a special sentence of community or parole supervision for life. A program to monitor these sex offenders should be established.
>
> [N.J.S.A. 30:4-123.90.]

Pertinent to the instant appeal, persons subject to SOMA automatically include those whose "risk of reoffense has been determined to be high" -- defined as any person designated as a Tier III offender under Megan's Law, N.J.S.A. 2C:7-8. N.J.S.A. 30:4-123.91(a)(1). Monitored individuals also include, definitionally, individuals who the Chairman deems appropriate for GPS monitoring under the Act and who fall within one of three categories, one category being persons having been sentenced to PSL. Id. at (a)(2).

SOMA directs that monitoring include (1) "[t]ime-correlated or continuous tracking of the geographic location of the monitored subject using a [GPS]" and (2) "[a]n automated monitoring system that can be used to permit law enforcement agencies to compare the geographic positions of monitored subjects with reported crime incidents and whether the subject was in the proximity of such reported crime incidents." N.J.S.A. 30:4-123.92(b). SOMA further directs the Board to "develop procedures to determine, investigate, and report on a 24 hours per day basis a monitored subject's noncompliance with

the terms and conditions of the program." N.J.S.A. 30:4-123.92(c). Any report of noncompliance is investigated immediately by law enforcement or a parole officer. Ibid. SOMA also provides that the information collected through monitoring may be used to "prepar[e] correlation reports for distribution and use by federal, State, county and municipal law enforcement agencies." N.J.S.A. 30:4-123.93.

In regulations promulgated to implement SOMA, the Board tracks SOMA's requirement that a person "whose risk of re-offense has been determined to be high" under Megan's Law is automatically enrolled in GPS monitoring. N.J.A.C. 10A:72-11.1(a)(1).[8]

A person subject to GPS monitoring must: (1) meet with an assigned parole officer for installation of the GPS monitor; (2) insure that the device is charged daily and remains charged; (3) advise the parole officer if the device becomes inoperable; (4) refrain from interfering with the device; (5) pay for the cost of repair or replacement of the device if the loss or damage is caused by the person; (6) maintain physical control over the device when leaving his

---

[8] Although not applicable to H.R., the regulations also dictate the process for the Chairman to deem persons appropriate for GPS monitoring consistent with N.J.S.A. 30:4-123.91(a)(2). See N.J.A.C. 10A:72-11.1(a)(2). When a person is placed on GPS monitoring pursuant to the Chairman's determination, the offender's case is reviewed every 180 days to determine whether GPS monitoring should continue. N.J.A.C. 10A:72-11.4(a).

or her residence; (7) provide the parole officer with reasonable access to the device for maintenance or diagnostics; (8) provide the parole officer with immediate access to the device "to investigate a report of non-compliance with a condition of the [program]"; (9) inform the parole officer of a change in residence no later than ten days prior; (10) inform the parole officer of anticipated travel outside of the state; and (11) provide the parole officer with information related to employment. N.J.A.C. 10A:72-11.5(a).

If a person is also sentenced to PSL, the person must comply with the requirements of PSL as well as the above-listed requirements. N.J.A.C. 10A:72-11.5(b).

IV.

A.

The parties do not dispute that the GPS monitoring of H.R. constitutes a search for purposes of this constitutional challenge. Any argument about that was abandoned after the trial court concluded it was a search, citing the United States Supreme Court decision in Grady.

In Grady, the Supreme Court held that, for purposes of the Fourth Amendment, "a State . . . conducts a search when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements." 575 U.S. at 309. The Appellate Division in this matter noted its

16

agreement with the trial court on that point.  H.R., 457 N.J. Super. at 257.  We also see it as beyond cavil and therefore now expressly hold that the continuous GPS monitoring of H.R. by securing a device to his body constitutes a search under Article I, Paragraph 7 of our State Constitution.  Cf. State v. Earls, 214 N.J. 564, 588-89 (2013).

There is also no dispute that H.R. was required to submit to GPS monitoring because he was designated a Tier III sex offender under Megan's Law.  That made him automatically subject to SOMA's GPS monitoring.  N.J.S.A. 30:4-123.91(a).  There was no individualized suspicion or warrant that preceded imposition of H.R.'s GPS monitoring.  Thus, for this search to be reasonable under Article I, Paragraph 7, it would have to "fall[] within a well-delineated exception to the warrant requirement."  State v. Brown, 216 N.J. 508, 516 (2014).  Here, the Board claims that the search falls within the special needs exception to that requirement.

B.

In this state, a warrant exception exists when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."  O'Hagen, 189 N.J. at 150 (quoting Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619 (1989)).  The special needs exception applies in this state "when the search is conducted for reasons unrelated to law

enforcement's investigation and prosecution of criminal activity and furthers an important state interest." State v. Harris, 211 N.J. 566, 582 (2012).

Under a special needs analysis, the first consideration is

> whether there is a special governmental need beyond the normal need for law enforcement that justifies [the search] without individualized suspicion. If there is a special need, we must next examine the privacy interests advanced by [the] defendant and any limitations imposed. Finally, we must weigh the competing governmental need against the privacy interests involved to determine whether [the challenged program] "ranks among the limited circumstances in which suspicionless searches are warranted."
>
> [O'Hagen, 189 N.J. at 158 (quoting State in Interest of J.G., 151 N.J. 565, 578 (1997)).]

In the threshold determination of whether a special need exists, we focus on the search's objective. Id. at 159-60. In that examination, we look to the explanation for the search's purpose, id. at 158, and "if the core objective of the police conduct serves a special need other than immediate crime detection, the search may be constitutional," id. at 160.

Once the purpose of the search is determined to serve a special need, then a court weighs the search's "encroachment on an individual's [privacy] interests against the advancement of legitimate state goals" to determine whether, on balance, the search is reasonable. J.G., 151 N.J. at 576; see also O'Hagen, 189 N.J. at 158. Thus, the second part of the test involves balancing

18

the relevant interests, which include "the affected [individual's] expectation of privacy, the search's degree of obtrusiveness, and the strength of the government's asserted need in conducting the search." Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 176 N.J. 568, 597 (2003).

Before turning to the application of those principles, however, we note that H.R. and the ACLU argue that the first part of the test requires a determination that the search is only minimally intrusive. We have never so held. The nature or degree of intrusiveness, even if highly intrusive, is a factor in the balancing performed in the second part of the special needs analysis. See, e.g., O'Hagen, 189 N.J. at 161-63; Joye, 176 N.J. at 597-600; J.G., 151 N.J. at 580; N.J. Transit PBA Local 304 v. N.J. Transit Corp., 151 N.J. 531, 660-62 (1997). In each such example, we conducted the balancing analysis and considered the invasiveness of the search, any limitations imposed, and whether those subject to the search had a diminished expectation of privacy. The invasiveness of the search alone is not dispositive and does not foreclose the balancing test.

19

V.

A.

Examination of the objective of a search performed under the auspices of a state statute begins "with the purposes enumerated by the Legislature." O'Hagen, 189 N.J. at 158.

Here, the opening section of SOMA, in which the Legislature sets forth its findings and declarations, expresses concern about the high recidivism rates of sex offenders and the "unacceptable level of risk" such offenders pose to the community. See N.J.S.A. 30:4-123.90(a). SOMA declares that "[i]ntensive supervision" of such "offenders is a crucial element in both the rehabilitation of the released inmate and the safety of the surrounding community." Id. at (b). Further, the Act declares, in the wake of the piloting of GPS monitoring over a two-year period, that "[t]echnogical solutions currently exist to provide improved supervision and behavioral control of sex offenders following their release." Id. at (c). The Legislature called the GPS program "a valuable and reasonable requirement for those offenders who are determined to be a high risk to reoffend." Id. at (e).

From that plain and direct statutory language, we discern that the prime purpose of establishing SOMA's permanent program of continuous satellite monitoring is to enhance the State's supervision of sex offenders at high risk to

20

reoffend. That overriding purpose furthers the declared goals of community protection and deterring recidivism, thereby advancing the monitored subject's rehabilitation. Those purposes were properly recognized by the trial court and Appellate Division as legitimate special needs.

That there is mention of the monitoring information's capacity to be linked to new crimes, see id. at (d), bears noting, to be sure; but in the same sentence the Legislature recognized that same link's capacity to exonerate monitored subjects who had no proximity to an event that happens to be under investigation. Clearly, a criminal investigation is not the prompt for imposition of monitoring under SOMA. Subsection d's reference to potential new charges is no more than an acknowledged ancillary consequence, not the chief purpose of SOMA's enhanced monitoring.

Similarly, SOMA's allowance of information-sharing among law enforcement agencies, see N.J.S.A. 30:4-123.93, does not make monitoring a criminal-purpose search. SOMA does not subject random members of the public to monitoring in the hope of catching someone committing any crime or to aid in general criminal investigations.[9] Rather, the monitoring focuses on a discrete class of persons at high risk of reoffense.

---

[9] In contrast, in City of Indianapolis v. Edmond, the United States Supreme Court invalidated a narcotics checkpoint program where any motorist on the road could be subjected to the stop. 531 U.S. 32, 34-35 (2000). Likewise, in

21

A search qualifies as a special needs search if "the central purposes of the [search] are not intended to subject the [target of the search] to criminal charges." O'Hagen, 189 N.J. at 159. That holds true even when "the enumerated purposes may involve law enforcement to some degree." Ibid. The criminal enforcement consequences that could flow from SOMA's GPS monitoring are ancillary, not central.

We hold that the legislatively enumerated purposes -- enhanced supervision, community protection, deterrence, and rehabilitation -- provide the surest guide to the purpose of SOMA's GPS monitoring. And those purposes demonstrate that a special need -- not an immediate need to gather evidence to pursue criminal charges -- motivates the GPS monitoring prescribed by the Legislature. That satisfies the first step in a special needs analysis and allows the determination that this search may be constitutional. Id. at 160. Next, the interests of the parties come into play. We turn to that second part of the special needs test.

---

Ferguson v. City of Charleston, the Supreme Court invalidated a program that drug tested pregnant patients where any woman could be subjected to testing simply by meeting one of nine criteria. 532 U.S. 67, 71-72, 71 n.4 (2001).

22

B.

1.

With respect to the nature of the invasion here, this Court has already taken a detailed look at continuous GPS tracking. In <u>Riley v. State Parole Board</u>, we reviewed the realities of being subjected to GPS monitoring. 219 N.J. 270, 293-96 (2014). That review, now enhanced by H.R.'s personal account about wearing the device, reveals that GPS monitoring significantly infringes on an individual's privacy interests. We reject the Board's minimization of the intrusiveness involved as only revealing the subject's location. That does not do justice to what life is like tethered to an ankle bracelet as part of continuous GPS monitoring. And, to the extent that the Board relies on a single out-of-state decision in claiming that the monitoring inflicts a minimal or slight invasion of privacy, citing <u>Belleau v. Wall</u>, 811 F.3d 929 (7th Cir. 2016), we note that we have taken a different view of the realities of the circumstances.[10]

Continuous GPS monitoring is more invasive than any special needs search we have allowed in the past, both suspicionless ones and those that required some level of individualized suspicion. <u>See</u> <u>O'Hagen</u>, 189 N.J. at 163

_____

[10] <u>Belleau</u> expressly rejected this Court's decision in <u>Riley</u> and dismissed this Court's characterization of the realities of wearing the GPS device as "hyperbolic." 811 F.3d at 938.

23

(permitting suspicionless DNA swab of convicted persons' inner cheek); Joye, 176 N.J. at 607 (permitting suspicionless drug and alcohol testing of high school students participating in extracurricular activities); J.G., 151 N.J. at 587-88 (permitting suspicionless HIV testing of sex offenders); N.J. Transit, 151 N.J. at 564-65 (permitting suspicionless drug testing of transit employees); see also New Jersey v. T.L.O., 469 U.S. 325, 342-43 (1985) (holding that a student's purse may be searched by school officials based on reasonable suspicion); State v. Best, 201 N.J. 100, 114 (2010) (extending T.L.O. to the search of a student's car parked on school property).

Moreover, unlike those cases, which involved temporally limited, one-time searches, this search is continuous. This is an invasive search, and we do not underestimate it in our analysis.

2.

That this is an invasive search makes the inquiry into the privacy interest affected a very important consideration. Here, H.R.'s status as a Tier III sex offender and a PSL parolee places him in the position of having a severely diminished expectation of privacy.

As a Tier III sex offender, H.R. is subject to the registration and community notification provisions of Megan's Law: N.J.S.A. 2C:7-13 (publication on the New Jersey Sex Offender Internet Registry); N.J.S.A.

24

2C:7-8(c)(2) (notification to schools and certain organizations in the community); N.J.S.A. 2C:7-8(c)(3) (door-to-door notification to members of the public likely to encounter plaintiff); and N.J.S.A. 2C:7-2 (periodic registration and verification with law enforcement).

Moreover, H.R. is subject to PSL. Among the more than twenty-five conditions that status imposes on his everyday life are polygraphs, curfews, travel restrictions, face-to-face visits, and searches of his home, vehicle and person based on reasonable suspicion. N.J.S.A. 2C:43-6.4(f); N.J.A.C. 10A:71-6.12(d). His status is that of a parolee -- for life. It is well established that "it is constitutionally permissible to subject parolees to 'conditions [that] restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen.'" J.B. v. State Parole Bd., 229 N.J. 21, 40 (2017) (alteration in original) (quoting Morrissey v. Brewer, 408 U.S. 471, 478 (1972)).

Given the conditions to which H.R. is subject as a PSL parolee and the judicial recognition that PSL parolees may be subjected to restrictions beyond what may ordinarily be constitutionally imposed, H.R. has little to no expectation of privacy to assert.

25

3.

In the assessment of the governmental interest, all parties acknowledge that the State's interest in deterring and preventing sexual offenses is compelling and well recognized in our jurisprudence. See Doe v. Poritz, 142 N.J. 1, 89 (1995); see also J.B., 229 N.J. at 41 ("We have acknowledged that the State has a significant interest in ensuring adherence to the restrictive conditions imposed pursuant to PSL . . . 'to protect the public from recidivism by defendants convicted of serious sexual offenses.'" (quoting Jamgochian v. State Parole Bd., 196 N.J. 222, 237-38 (2008))). In enacting SOMA, the Legislature reiterated that compelling interest. N.J.S.A. 30:4-123.90.

Because, in a special needs analysis, the strength of that interest still must be evaluated in context, see Joye, 176 N.J. at 597, H.R. contends that the governmental interest should not be regarded as compelling. The Board points to the data and experience contemporaneous with SOMA's enactment -- relied upon by the Legislature -- indicating sex offenders pose a heightened risk of recidivating, citing N.J.S.A. 30:4-123.90. H.R. counters that other research supports that sex offense recidivism rates are lower than initially believed.

H.R. cites two articles critical of the basis for two United States Supreme Court cases that have served as underpinnings for justifying sex offender legislation and, in particular, sex offender registries. See Ira Mark

26

Ellman & Tara Ellman, "Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics, 30 Const. Comment. 495 (2015); Melissa Hamilton, Constitutional Law and the Role of Scientific Evidence: The Transformative Potential of Doe v. Snyder, 58 B.C. L. Rev. E. Supp. 34 (2017). The articles are of limited value to this case because SOMA is aimed at high-risk sex offenders and thus those studies, which conclude that overall sex offender recidivism rates are not as high as once believed, are not particularly relevant. We do not conclude that the cited research diminishes the value to be accorded to the governmental interest in enhanced monitoring of high-risk sex offenders who are Tier III and on PSL.

Further, another cited study analyzed the recidivism rates of high-risk sex offenders. See R. Karl Hanson et al., High-Risk Sex Offenders May Not Be High Risk Forever, 29 J. Interpers. Violence 2792 (2014). That study showed high-risk offenders' recidivism risk was "cut in half for each 5 years that they remained offense-free in the community," id. at 2805, and that high-risk offenders reoffended more quickly than other groups, id. at 2799. The Hanson article supports the proposition that, unless high-risk sex offenders actually remain offense free, the recidivism rates range from a five-year rate of 22%, a ten-year rate of 28.8%, and a fifteen-year rate of 31.8%. Id. at 2802. Those results led the authors to suggest that intervention and monitoring

27

should be most intense during the first years of release and then decrease for those who remain sex-offense-free. Id. at 2806-08. Thus, the State's interest in ensuring that high-risk offenders remain sex-offense-free is arguably heightened especially in the first years of their release, in order to achieve lower recidivism rates.

Finally, H.R. asserts that the State has other tools at its disposal to use instead of enhanced monitoring, such as Megan's Law and PSL. We reject the argument that the State's need for GPS tracking is diminished due to the availability of those other tools. That the State has other tools available to it does not undermine the weight to be given to the Legislature's determination that more intensive supervision is appropriate, particularly after a pilot test period reinforces the salutary benefits of enhanced monitoring. We see no diminution in the governmental interest in this respect.

4.

In balancing the interests, we conclude that although GPS monitoring is a significantly invasive search, it is outweighed by the compelling government interest advanced by the search and H.R.'s severely diminished expectation of privacy.

H.R.'s PSL status is critical to our conclusion. His privacy interests must be regarded in this balancing as extremely low; the GPS monitoring does

not amount to as substantial of an invasion of privacy as it would on individuals not subject to PSL.[11]

H.R. nonetheless argues that in earlier special needs cases involving drug testing and DNA samples there were restrictions or protections that limited the intrusion on privacy and were considered when evaluating and balancing the invasion of privacy.  See, e.g., O'Hagen, 189 N.J. at 162-63; Joye, 176 N.J. at 598-600; N.J. Transit, 151 N.J. at 560-61.  And here, he says, there are none.  That argument is unavailing, however, because his severely diminished expectation of privacy as a result of his PSL status renders this case different from all others where such diminished privacy expectations were lacking.

On balance, we conclude that H.R.'s diminished privacy interests as a Tier III Megan's Law sex offender on PSL are outweighed by the State's interest in deterring and rehabilitating him as a high-risk sex offender.  We consider only the case before us, which is exclusively an as-applied challenge to SOMA's imposition of GPS monitoring on H.R. immediately following his release from incarceration and being designated as Tier III.  This matter does

---

[11]  Here, although he is not before us, we note for comparison's sake only the different outcome reached by the trial court and Appellate Division with respect to I.R., who unlike H.R. was not on PSL.

29

not entail any challenge to the time within which such monitoring is reviewed. In that regard, we note, as the Board points out, that a Megan's Law offender may file a motion with a judge for a change in tier designation based on a change in circumstances.

## VI.

The judgment of the Appellate Division is affirmed.


CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion.